## WILLIAM HASSETT vs. JOHN H. CARROLL.

Third Judicial District, Bridgeport, October Term, 1911.
HALL, C. J., PRENTICE, THAYER, RORABACK and WHEELER, Js.

General Statutes, § 1368, provides that any trustee or officer of an "institution" receiving aid from the State, who furnishes it with supplies, except as the lowest bidder after open competition, shall be fined. *Held* that while the words of the statute might be sufficiently comprehensive to include, among other corporations or associations, established institutions of learning, they did not aptly describe and were not intended to embrace a school district composed of the inhabitants resident in a prescribed territory; and therefore sales and deliveries of coal to such a school district by one of the members of its committee, who was a retail coal dealer, without competition, did not constitute violations of the statute.

School districts are political subdivisions of the State created by it for the purpose of maintaining and administering the governmental duty of public education which it has assumed; and, as such, are mere agencies or instruments of the State in the discharge of that duty.

A priest and pastor may criticise from the pulpit the official acts of a public officer who is a member of his congregation, provided he act in good faith in so doing; but he cannot make his sermon the medium for bringing false, malicious and criminal accusations against another, and when sued for his slanderous utterances insist that they were privileged communications spoken for the good of his parishioners or the public.

No liability exists for the publication of defamatory matter, however false and malicious, if published under an absolute privilege; but the class of absolutely privileged communications is narrow and is practically limited to legislative and judicial proceedings and to acts of State. Where the defamatory words are published under a qualified or conditional privilege, proof of express malice is required in order to render the defendant liable.

Words which charge the plaintiff with the commission of a criminal offense are actionable *per se*.

Where the time, place, manner and other circumstances attending the utterance of alleged slanderous words are undisputed, the question whether the occasion was privileged or not is one of law for the court. A privileged occasion will not, however, protect a defendant, if his slanderous utterances were actuated by express malice and with a view of injuring the plaintiff, and this is a question for the jury.

Hassett *v.* Carroll.

"Malice" in libel and slander does not necessarily imply hatred, spite or ill will, but merely that the false statements were published in an improper and unjustifiable manner, or with improper and unjustifiable motives.

Not only the language used, but the time, place, manner and other circumstances attending the preparation and publication of the defamatory matter, are admissible in evidence as affecting the question of malice.

Where no special damages are claimed, the amount recoverable in an action for libel or slander should be limited to compensation for those injuries which the law presumes have followed as the natural and proximate result of the publication, viz: the damaged reputation of the plaintiff, his injured feelings, the humiliation, insult and disgrace to which he was subjected by the defamatory charges, and his expenses of litigation less the taxable costs.

While the amount of damages allowable in such cases rests to a considerable extent in the discretion of the jury, their verdict is subject to revision if it appears that the sum awarded was perversely excessive, or was the result of gross error either in a matter of principle or in a misconception of the case, or that the jury were influenced by improper motives.

The common law doctrine of punitive damages, which practically permitted juries to award any sum they saw fit, is no longer the law of this State, if indeed it ever was.

In the present case the jury returned a verdict for the plaintiff for $4,000 damages. *Held* that this sum was too large, and that a new trial would be ordered unless the plaintiff remitted $1,500 from the amount of the verdict.

Argued October 24th—decided December 19th, 1911.

ACTION to recover damages for slander and libel, brought to the Superior Court in New Haven County and tried to the jury before *Holcomb, J.;* verdict and judgment for the plaintiff for $4,000, and appeal by the defendant. *Error and new trial ordered nisi.*

The plaintiff, a resident of Wallingford in this State, is a member of the Holy Trinity Roman Catholic Church of that place; he has for many years been a member of the Central School district committee of Wallingford, and been engaged in the retail coal business in that town.

The defendant is a Roman Catholic priest, and is the pastor of said church.

On Sunday, the 12th of September, 1908, at each of three masses held on that day, one of which was attended by the plaintiff's children and another by the plaintiff and his wife, the defendant read from the pulpit to the congregation certain writings previously prepared by him concerning the plaintiff, which are set forth in the complaint, parts of which are printed in the footnote.*

---

* "I have a very disagreeable duty to perform this morning, my dear people, about the school. Fearing I might detain you too long, I have put my thoughts in writing, and I want you to pay particular attention to them.

"To-day, my dear people, I wish to call your serious and thoughtful attention to the studied indignity put upon your children, the lambs of my flock, and a Catholic teacher, a native-born Catholic teacher, by an Irish born and bred school committeeman, who on account of his scandalous actions against the conceded authority of your lawfully appointed pastor I would not dare call Catholic.

"This public servant insists, whether it pleases you or not, in placing your children in an ill-smelling, filthy and unsanitary building. A self respecting American pig would commit suicide rather than spend an hour in that mal-odorous pig sty.

"You elected this man, no doubt, and in spite of your pastor, to be your servant, to hire your daughters for school teachers when they were properly educated for that purpose, and to do it not as though it were doing you a favor or putting you under any sort of obligation to him, but as matter of justice and honesty in performance of his sacred duty that you have elected him to execute. But if we are to judge from his actions of many years duration, he is firmly convinced that he is your master, and the power you put in his hands he can use to humble you to your very knees, even scorn and refuse to grant what belongs to you by right.

"Any opposition which is noticed on your part he regards as impertinence and insubordination, not thinking in his pride of power that you who made him can speedily unmake him.

"For this sleek article knows well that he can wheedle his dupes with his soft talk which will enable him to put on again the cloak of power of his assumed right of authority.

"He uses every man and every woman, the schools, the teachers, and even the pastor himself if he could, to further his coal business. God help the man, woman or child, pastor or people that try to thwart him in this respect! Would he be allowed to if that microbe infested shack where he insists on putting your children were not heated with his coal!

Hassett *v*. Carroll.

These writings were given by the defendant to a reporter of a Meriden newspaper who copied.them and sent them to said paper for publication. They were returned to the defendant unpublished.

"Would he dare for one moment treat our respected and respectable Protestant friends in like manner?

"His tender solicitude about allowing the little ones to cross the track is deeply touching. It enables him to quote his reverend pastor's remark on last Sunday in support of his wisdom and humanity in sending Catholic children to these pest-holes, and making a Catholic school teacher leave her room in the Colony School, that he could replace her with a Protestant teacher. Again I ask, would our Protestant neighbors ever allow such a thing?

"The dangers of the railroad-crossing may with some little care be avoided, but who can avoid the bad ventilation, the malarial atmosphere and filthy surroundings of that germ-breeding school-room?

"It seems this man's policy is that any old thing is good enough for his Irish constituents. Now for the facts in proof of this assertion. Has he ever allowed a Catholic Irishman to be associated with him on that school board, in that very lucrative office, especially for a man in the coal business? When, years ago, the pastor suggested that such a thing could be very easily done, he replied, 'We have all we want now and we can afford to be generous.' Whom he meant there cannot be a shadow of doubt. . . .

"This self constituted champion of our rights and privileges represents nothing but his own interests. And it was simply to propitiate our fellow Protestant citizens by making them think that he controlled you and me, and anything to keep him feeding at the public crib he subsists upon, like a pack of blood hounds till they let up and cry for mercy.

"I have it on the best authority that he is and has been making deals with them, thus humbugging our people. You are all aware of another deal where he used all sorts of duplicity and trickery to oust a poor Catholic girl from the Colony Street school under the pretence of incompetency.

"Again it became my duty to defend this member of my flock from this injustice, and, thanks to my policy of never letting my bone go with any man, I succeeded in keeping her from being dismissed.

"Again with vindictiveness, he refused, as though he had a right to refuse, to hire another girl, a native of this town and an orphan, simply because her brother was my friend. This is the teacher he now puts in the pest house.

"On account of this I deemed it my duty to resent this high-handed conduct by giving to other parties the church coal which he had furnished for many long years. Immediately he stops his munificent sum

The complaint contains two counts. The first alleges that the defendant read said writings, as above stated, and the second that he published them by sending them to said reporter and to the editor of said news-

of two dollars to the monthly collection. The church that paid him thousands of dollars for his coal was now to lose that princely contribution.

"Now the war is on with the priest and war to the knife. The pastor must be down and ruined by any means fair or foul, and especially foul—no stone left unturned to hurt him with his own Catholic people. Even the vestry of the church must suffer his vengeance. He makes, even forces, the Catholic people to make his private quarrels their own. . . .

"A short time before this he solemnly states in the pastor's library, that no power on earth will induce him to accept the office of school committeeman if the board of education, of which I was then an honored member, would insist on engaging a superintendent. I very foolishly believed him and set about to get a good man in his place.

"You all know what happened that never-to-be-forgotten night when the Catholic henchmen of this lying trickster forgot their manhood and religion and insulted their pastor, who was solely and disinterestedly looking out for their interest and good.

"There was this fraud running for office with all his public dupes and followers making the night hideous with their yelling and cursing. In honor of this glorious victory the saloons kept open house that night by order of the victor. . . .

"Now let's see. A fellow member with me on the school board was suspected by the boss of being friendly with the pastor. During his absence in New York City, this powerful individual, by a trick that would bring the blush of shame to the cheek of a heathen Chinese, tried to remove him from that board. Did he do it? Not so you could notice it. . . .

"Then his anger against the pastor was now at white heat. He began now his lowest and craftiest sorts of tricks to down the priest. He forces the so-called Catholic doctor to sell his birthright of manhood and honesty for less than the scriptural mess of pottage, to run against the priest on the board of education. What did he promise him for his shameless perfidy? The position of health officer. Did he get it. Not yet, nor never while I can oppose him. What did the lawyer get? Nothing that you can see. What did the representative get? A large wind pudding with lemon sauce. What did the sleek article himself get? A salutary and well grounded fear that kept him from running for the water commissioner.

"Let us all fervently pray this wholesome fear may prevent him from running next June for school committeeman.

Hassett *v.* Carroll.

paper, both of whom read the same. The complaint asks for $10,000 damages. No special damages are alleged.

"Were my people to put this fellow in that office again, an A. P. A. or a North of Ireland Orangeman would deem him too treacherous and unclean to spit upon.

"In his written complaint against me to the bishop, he tells what he did years ago to prevent the Protestants from devouring us, body and soul. How two reverend curates were sent on the highways and by-ways to compel them to come to meeting. Why? To save themselves? Not at all, but as the bishop remarked, 'to save him from losing his coal.'

"Why should he break the law of the State and shut out the other poor coal dealers who have nothing else but their coal to depend upon, from honest competition? As long as you allow this in this borough you partake of his crime. . . .

"The proof of this — I want to tell you how many long years this man has been breaking the law. Here is the law. I am not talking through my hat, but I have facts that cannot be refuted. Now you know, my dear people, what will be the result of this.

"When I went up to protest the other night at the school committee, there I saw my friend's henchman. I wouldn't speak to him any more than I would speak to the wolf. . . .

"Your children are as dear to me as the apple of my eye, and any one who maltreats or hurts these children hurts me personally. I don't care what their nationality is, that never enters my mind. They are my children because they are God's. I am the pastor and the pastor supposes that he has sheep and lambs. And these are my lambs. And any man who will put insult on my people insults me to the core. And no matter what he is, if he were the King of England or the President of the United States, I would fight him to the bitter end.

"What right has he to put these Catholic children down in that pest hole? Would he dare do it to our Protestant neighbor? Not at all; because he had got power and he knows where he can use the lash.

"And now he has stated if you don't send your children there you will be arrested for not sending them to school. The law never meant anything of that sort, and if it did it would be an unjust law that you would not be bound to obey. If the public school insists on your sending your children, they must be fit public schools. They must not be pest holes or places that breed all sorts of microbes. Then why didn't he select a Protestant teacher to go there? Not at all. He insults our nationality by putting one that he has a spite against. . . .

"No one is allowed to sell on any committee or any political position, to sell any commodity to himself, under fine of $300 and a term of imprisonment for each occasion. In every other city and town and village

The second defense to said counts alleges in substance that in the performance of his duty as pastor the defendant read and published said writings in good faith, believing them to be true.

in this United States, bids are to be given in, sealed bids, and then the lowest bidder is to get the coal. Has there ever been any sealed bids given in since that man took the position? Never. He puts in the coal in any time he pleases.

"Then again it is against the law to put in that coal while the children are in session. What does he cart up to the Colony Street? There is more coal up there in that Colony Street school than there is in his coal bins, and he puts that in while the children are in session. What does he care about the children? Not at all, because their parents did give their body and soul to him by electing him to that position.

"Who weighs that coal? A man who is tricky enough to put in that coal by unlawful means is bad enough to give short weight. A man who would run his other brothers out of business in order to accomplish his ends—how can you trust a man of that sort?

"You have an object to accomplish, and are afraid to stand by your pastor who has only your good and your interest at heart. What good has he at heart except his own interest and his own good? And any one with an ounce of sense, with the brains of a louse, could understand that; could understand that a man of his place and position and his tricks, that all see this, that he is working these to the limit. And not only that, but he is even controlling the press.

"I wrote an article a short time ago, just before the last election for this school committeeman. I had to write it on the train in order to be in time so it could appear and that you men would go and assert your rights. But I couldn't get it in the paper. I approached several names. I couldn't get it in the paper. Now I wonder who it is who is buying the paper up. I can't get it in the paper. Just the same, although I was prevented, I will read that very letter, in order to show you that I am not afraid to read it and not afraid to assert the rights that you have. If you are not capable of asserting them yourselves I will assert them for you.

"Now listen to this and see if there is one word of exaggeration or untruth in it. I mean this was written for that occasion. The caption was 'Pertinent Questions with Pertinent Answers.'

" 'On next Thursday evening the citizens of this borough will be called upon to elect a school committeeman. The candidate to be honored will not of course be the people's choice, but the selection of the fellow committeeman who has, as far back as the writer's memory goes, chosen by unseemly tricks his fellow members of that board, and unvaryingly succeeded in electing his spineless tools.

" 'Why people of our education can be wheedled into doing this man's

A third defense to both counts alleges that the plaintiff "flagrantly and openly violated and defied the law and persistently committed a criminal offense" by refusing to call for bids for the furnishing of said coal for the schools, and in not awarding the furnishing of such coal to the lowest bidder.

The jury rendered a verdict for the plaintiff for $4,000.

The trial judge denied the defendant's motion to set it aside.

The entire evidence has been certified to this court.

*Walter J. Walsh,* for the appellant (defendant).

behest is to me a mystery past finding out. One would think that, far from pleasing, his blarney and flattery would disgust even his brainless dupes. Nevertheless his sweet manner is a thing to conjure with and he works it to its conjuring limit. His henchmen within the province of both parties smile and obey while he is handing it out to them in generous doses.

" 'The saccharine methods of this sly boss get people to work his ends and his fellow colleagues, but who shall pardon successful politicians of political parties who, under the influence of the cheap cajolery of this careful, calculating and shrewd self-seeker have surrendered their honest judgment and conscientious convictions? It makes honest people chafe to be obliged to live in the community under the regime of a trickster who uses every office for his own selfish ends.'

"So much for the introduction. Now for the questions.

" 'Is there any man who will go to that meeting on Thursday night courageous enough to ask the following pertinent questions? Who sells all the coal to all the schools in this borough? Has he or will he allow any competition? Who weighs the coal? Who commits this exclusive monopoly? As a leading member of this board does he commit this graft, or are the other parties by conniving, perhaps allowing him? Being on that board is he allowed to sell that committee coal or any other committee? Has not his attention been called to the fact that there is a fine and term of imprisonment attached to violation of this law? Does he not laugh and jest at such a law when other dealers threaten him with it? How long will this wholesale graft and open and contemptuous violation of the law be permitted to continue? If this board permits itself to be the subservient instrument to carry out the will of this dominating member, can he not in like manner, and as a matter of fact he does, hire all the teachers for all the schools and thus

Hassett *v.* Carroll.

*E. P. Arvine* and *Jacob P. Goodhart,* with whom was *Oswin H. D. Fowler,* for the appellee (plaintiff).

HALL, C. J.   Of the numerous reasons of appeal assigned in the record, we shall consider only those discussed in the defendant's brief.

The first of these relates to the interpretation placed by the trial court upon § 1368 of the General Statutes, which reads as follows: "Every person who, being a trustee, or officer, of any institution receiving aid from the state, shall furnish supplies, or be interested in any contract for furnishing supplies to such institution,

rule with a rod of iron, the native born citizens? Just what is the state of affairs in this borough? I ask you in trepidation, what part does the purchase of coal play in the employment of teachers and the education of our children? A very important one.

" 'A small matter that he thinks himself superior to law and the principles of common justice, when he is allowed to ride rough shod over the common people who do not dare to resent his arrogance or question his right to hire all the teachers and sell his coal to all the schools without let or hindrance. . . .

" 'Thinking that the clergyman's superiors were as easily hypnotized by his diaphanous, swiss muslin sort of voice as his parishioners, he sneaks up to the episcopate with his complaints. This pompous old humbug gets a most frigid reception and is told to go home, and if he has any grievances to put them in writing. . . . For this czar of Wallingford has waxed so fat and saucy with extraordinary power, that any one, be he priest, bishop or pope, who stands in the way of his selfish aggrandizement must be removed from office, political or ecclesiastical.

" 'Who has not heard of his wonderful sacrifices he has made in behalf of our public school? Sacrifices that bring their own reward from the town treasury in checks for thousands of dollars. Oh, let the dear public share even a little in those sacrifices which result in such rich and abundant returns.

" 'To be candid, dear dictator, it would take the most powerful microscope to find enough of your sacrifices for the sake of any one else except yourself to fill the eye of a cambric needle. That is worthy of a Mr. Pecksniff. Let concealment be met by openness, by telling the truth, by opening the doors, by turning on the light, and fighting to a man at the next election for consolidation. If you fight for consolidation that man is out of doors. That is policy. Then thank the Lord heartily, your next sore will be removed.' "

unless he be the lowest bidder for such supplies, or for such contract, after open competition, shall be fined fifty dollars."

It was undisputed at the trial that the plaintiff had for many years been a member of the school district committee of the Central School district of Wallingford, and that, in connection with his retail coal business, he had for many years sold coal to said school district without asking for competitive bids from other coal dealers.

The defendant claimed and requested the court to charge the jury that such acts were in violation of the provisions of § 1368, and constituted proof of the truth of certain of the charges contained in said writings.

The court did not so charge, but instructed the jury that said school district was not an "institution" within the meaning of that word in § 1368, and that such sales of coal by the plaintiff to the school district, without competitive bids, were not violations of the provisions of said statute.

The instruction so given was correct. It was one of the statutory duties of the district committee to furnish fuel for the schoolrooms in the district. General Statutes, § 2233. The statute does not direct how such fuel shall be purchased or provided. If, with the approval of the committee, the plaintiff himself, as a coal dealer, furnished it at as low a price as it could be obtained elsewhere, he committed no illegal act by so doing, unless § 1368 imposes a punishment upon him for such acts. If it does, he rendered himself criminally liable to a fine of $50 for every such act.

By the language of said section the persons who become liable to such punishment must be (1) trustees or officers, (2) trustees or officers of institutions, (3) trustees or officers of institutions receiving aid from the State.

The plaintiff, as a member of the school district committee, was clearly an officer of the school district. By statute the committee are made agents of the school district. General Statutes, § 2174. As such they were public agents and officers, performing governmental duties. *Ogden* v. *Raymond,* 22 Conn. 379.

But is the school district, of which the plaintiff was an officer, an "institution" within the meaning of that word in § 1368? This section is a penal statute, and should therefore be strictly construed. It should not be held that the plaintiff has rendered himself liable to the criminal punishment which it imposes, unless it clearly appears that the word "institution" was intended to embrace such an establishment as a school district.

Our statutes have made school districts bodies corporate for certain prescribed purposes, and have empowered them to lay taxes and borrow money for the accomplishment of those objects. General Statutes, § 2177. School districts are quasi corporations of a public nature, with limited powers, strictly defined by statute. *Hotchkiss* v. *Plunkett,* 60 Conn. 230, 234, 22 Atl. 535. They are not permanent corporations. Generally they may be formed, altered or dissolved by the towns within the limits of which they exist. General Statutes, § 2175. They are not separate corporations from the town or State, with the ordinary powers of corporations, nor independent corporations themselves for all the purposes of common school education. Their regulations, in the conduct of schools, are generally subject to those of the towns within the limits of which they are situated. General Statutes, § 2177. *Bartlett* v. *Kinsley,* 15 Conn. 327, 334. They are generally parts of towns, and always territorial corporations, forming political subdivisions of the State itself, for the purpose of maintaining and administer-

ing the system of public education, and are therefore mere agencies or instruments of the State for the effectual performance of the governmental duty of the education of children, which is assumed by the State. *Gilman* v. *Bassett*, 33 Conn. 298, 304; *State ex rel. Walsh* v. *Hine*, 59 Conn. 50, 60, 21 Atl. 1024; *People ex rel. C. & St. L. R. Co.* v. *Trustees of Schools*, 78 Ill. 136.

The statutes to which our attention has been called as showing that the school district in question receives aid from the State, are §§ 2157, 2257 and 2242. The provisions of § 2157 do not apply to the school district of which the plaintiff was an officer, but only to those school districts described in § 2154 and which elect a board of education instead of a district committee. The funds referred to in § 2257 are paid by the comptroller's order to the treasurers of towns, and not by the State to the school districts. There appears to be no evidence that the school district ever availed itself of the aid which it might have received under § 2242.

While the words of § 1368 may be sufficiently comprehensive to include, among other corporations or associations, established institutions of education or learning, we think they do not aptly describe, and were not intended to embrace, such municipal districts, or corporations composed of the inhabitants of certain territory (*State ex rel. Bulkeley* v. *Williams, Treasurer*, 68 Conn. 131, 156, 35 Atl. 24, 421), as the school district of which the plaintiff was an officer.

Upon the question of privileged communications the defendant, among other requests, asked the trial court, in substance, to charge the jury that if the defendant, as a priest, prompted by a sense of duty to his parishioners, made such publications in the manner stated, in good faith, and honestly believing them to be true, the verdict should be for the defendant; that every communication is privileged which is made in good

faith to obtain redress for an injury, or to prevent or punish some public abuse; and that the defendant had a right to criticise the doings of the plaintiff as a public officer, so long as his criticisms were fair and just.

The trial court charged the jury that if they found the defamatory words true, even if they were published from malicious and vindictive motives, they should return a verdict for the defendant, and further charged as follows: "The official acts and conduct of any person holding public office are 'proper subjects of comment and criticism, and any such comments and criticism were proper on the part of the defendant, and it might properly be hostile criticism, provided such criticism was kept within the limits of an honest intention to discharge a public duty, and was not made the means of promulgating slanderous and malicious allegations. But his position or office of parish priest gave him no right as to such criticism, under the claim that it was a part of a sermon to his congregation, which was greater than that possessed by him as a citizen, or which was superior to the right of such criticism possessed by any other person interested in and affected by such official acts. The circumstances under which it is admitted the words were spoken, and the subject-matter of the words recited in paragraph 5 of the complaint, disclose no conditions of absolute or of qualified special privilege. . . ."

The publication of defamatory words may be under an absolute, or under a qualified or conditional, privilege. Under the former there is no liability, although the defamatory words are falsely and maliciously published. The class of absolutely privileged communications is narrow, and practically limited to legislative and judicial proceedings, and acts of State. One publishing defamatory words under a qualified or conditional privilege is only liable upon proof of express

malice. *Blakeslee & Sons* v. *Carroll*, 64 Conn. 223, 232-235, 29 Atl. 473; *Dennehy* v. *O'Connell, Roche* v. *O'Connell*, 66 Conn. 175, 181, 33 Atl. 920. The only privilege which the defendant could have invoked in this case was the conditional or qualified privilege.

The court properly charged the jury that the position of the defendant as a pastor did not justify these publications, if the charges were false, and that the circumstances under which it was admitted the words were spoken, and the subject-matter of the publications themselves, disclosed no conditions of absolute or of qualified special privilege. Odgers on Libel & Slander (5th Ed.) 285; Townshend on Slander & Libel (4th Ed.) § 241b; Newell on Slander & Libel (2d Ed.) 527; *Fitzgerald* v. *Robinson*, 112 Mass. 371; *Burt* v. *Advertiser Newspaper Co.*, 154 Mass. 238, 242, 244, 28 N. E. 1.

The words published were actionable *per se*, in charging the plaintiff with an offense for which he was liable to criminal punishment, in imputing to him official misconduct as a public officer and dishonesty in the conduct of the business in which he was engaged. These charges were found to be false. The legal character of the occasion upon which these charges were made was a question for the court, but the character of the use which the defendant made of that occasion was a question for the jury. *Atwater* v. *Morning News Co.*, 67 Conn. 504, 513, 34 Atl. 865.

That the defendant believed the false charges to be true did not justify him in publishing them in an improper and unjustifiable manner, or with improper and unjustifiable motives. Proof that they were published in such manner and with such motives was sufficient proof of malice to meet the provisions of §767 of the General Statutes, which require that in actions of libel and under stated circumstances, the plaintiff must

prove malice in fact. This statute does not require that evidence must be offered of malignity, spite, or ill-will, nor that those facts should be found. *Osborne* v. *Troup,* 60 Conn. 485, 493, 23 Atl. 157; *Moore* v. *Stevenson,* 27 Conn. 14; *Hotchkiss* v. *Porter,* 30 Conn. 414, 422; *Wynne* v. *Parsons,* 57 Conn. 73, 17 Atl. 362.

The time, place, manner, and other circumstances of the preparation and publication of defamatory charges, as well as the language of the publication itself, are admissible evidence to show that the false charge was made with malice. Newell on Slander & Libel (2d Ed.) 532; *Hotchkiss* v. *Porter,* 30 Conn. 414, 422; *Osborne* v. *Troup,* 60 Conn. 485, 493, 23 Atl. 157.

The time, place, manner, and language of the publication in this case were undisputed. The position and relation of the parties, the very remarkable circumstances of time, place and manner of publication, the intemperate and violent language contained, and the abusive epithets applied in, the writings themselves, could, upon the evidence before us, justify no other conclusion than that manifestly reached by the jury, that the publication was malicious, and was made with improper and unjustifiable motives, and rendered the defendant liable in damages.

Did the trial court err in denying the defendant's motion to set aside the verdict of $4,000 upon the ground that such damages were excessive?

No special damages were alleged or proved. The plaintiff was therefore entitled to recover only general damages, for such words as were actionable *per se,* and the court so instructed the jury. The court also properly instructed the jury that any so called punitive damages awarded must be limited to a reasonable sum for the expenses of this litigation, less the taxable costs recoverable. The damages recoverable should therefore have been limited to a sum sufficient to compen-

sate the plaintiff for those injuries which the law pre-
sumed as the natural and proximate results of the
publication; *Wynne* v. *Parsons*, 57 Conn. 73, 17 Atl. 362;
such as his damaged reputation; his injured feelings;
the humiliation, insult and disgrace to which he was
subjected by the defendant's false charges, and the
time, manner, and language in which they were made,
and for his said expenses of litigation less the recoverable
costs.  *Noxon* v. *Remington*, 78 Conn. 296, 61 Atl. 963;
Newell on Slander & Libel (2d Ed.) 424, 864.

While the amount of such damages rests to a great
extent in the discretion of the jury, courts have always
exercised the right of revising the amount of damages
allowed, either by granting a new trial absolutely or con-
ditionally, when satisfied either that the sum awarded
was perversely excessive, or was the result of some
gross error on a matter of principle, or that the jury
misconceived the case, or were influenced by undue
motives.    Newell on Slander & Libel (2d Ed.) 848;
*Woodruff* v. *Richardson*, 20 Conn. 238, 243; *Noxon* v.
*Remington*, 78 Conn. 296, 61 Atl. 963.

From the amount of the verdict we think the jury
must have failed to understand that the damages to be
awarded were practically to be compensatory, or at
least not punitive beyond the allowance for expenses
of litigation.  The actions and language of the defendant
were unlawful and unjustifiable, and were undoubtedly
most exasperating to the plaintiff, yet he appears to
have voluntarily attended the church to hear them
repeated, and it does not appear that he has seriously
suffered in his reputation.  Under our laws, it is not the
purpose of this action to punish the defendant for his
offense, but to compensate the plaintiff for his injuries.
The common-law doctrine of punitive damages, which
allowed juries to award damages beyond mere com-
pensation and practically at their own discretion, is

no longer the law of this State.  *Hanna* v. *Sweeney*, 78 Conn. 492, 62 Atl. 785.

We think the verdict was too large under our rule of damages.

In *Haight* v. *Hoyt*, 50 Conn. 583, which was an action of slander, the defendant charged the plaintiff with having burned his barns.  This court granted a new trial upon the ground that a verdict of $4,000 was too large, and showed that the jury did not comprehend the true rule that should govern in the assessment of damages.

We do not recall any case of slander or libel in this State where a verdict as large as the one in this case has been allowed to stand.  We are not aided upon this question by decisions of other tribunals in which the common-law rule of punitive damages is applied in such actions.

There were no errors in the rulings upon questions of evidence discussed in the defendant's brief which would entitle him to a new trial, or which call for discussion.

The trial court erred in not granting, either absolutely or conditionally, the defendant's motion for a new trial upon the ground that the damages were excessive, and a new trial is ordered unless the plaintiff shall within ten days file with the clerk of the trial court a *remittitur* of the sum of $1,500 from the amount of said verdict.

In this opinion the other judges concurred.