JAMES MONCZPORT *vs.* CORNELIUS CSONGRADI ET AL.

Third Judicial District, New Haven, January Term, 1925.
WHEELER, C. J., BEACH, CURTIS, KEELER and HAINES, Js.

Whether the occasion upon which alleged libelous statements were published was privileged or not, presents a question of law for the court; if it was, then the character of the use which the defendant made of the occasion is a question of fact for the jury.

The trial court properly instructed the jury that the defendants' positions as editor and publisher of a newspaper gave them no greater latitude than that enjoyed by any other person in discussing the words or conduct of a private individual such as the plaintiff; and that, therefore, the defendants' special defense of conditional privilege presented no issue for their consideration.

In passing upon the question of whether or not a verdict is excessive, this court reviews the action of the trial court in granting or denying the motion to set it aside, and deals only incidentally with the action of the jury.

The ruling of the trial court upon such a motion involves an exercise of legal discretion, a clear abuse of which must appear to warrant a reversal by this court on appeal.

The defendants published in their newspaper, having a circulation of more than five thousand among the Hungarian residents of Bridgeport and vicinity, certain false and malicious statements in the Hungarian language to the effect that the plaintiff was a trouble maker, that he endeavored to disrupt a public gathering, had wilfully interrupted an assembly of people who had met for a lawful purpose, had committed a breach of the peace and urged others to do likewise, and had attempted to foster and inculcate a hostile and unpatriotic spirit among the Hungarian residents of Bridgeport. In response to a demand for retraction, the defendants first published more scandalous matter concerning the plaintiff and then, six weeks after the original libel, printed only a partial withdrawal. The plaintiff offered no substantial evidence as to special damages, but sought compensation for the general injury to his reputation and feelings through the ridicule and humiliation to which he had been subjected, and for the expenses of his litigation less recoverable costs. The jury rendered a verdict for $5,000, which the trial court ordered set aside unless a *remittitur* of $2,500 was filed.

Monczport *v.* Csongradi.

*Held* that the verdict, as amended, was not excessive. (*One judge dissenting.*)

Argued January 20th—decided May 12th, 1925.

ACTION to recover damages alleged to have resulted from the publication by the defendants of libelous articles concerning the plaintiff, brought to the Superior Court in Fairfield County and tried to the jury before *Maltbie, J.;* verdict for the plaintiff for $5,000, of which $2,500 was remitted by the plaintiff to avoid having the verdict set aside as excessive, and from a judgment for the plaintiff for $2,500, the defendants appealed. *No error.*

*Samuel Reich,* for the appellants (defendants).

*Joseph G. Shapiro,* with whom was *Harry Allison Goldstein* and, on the brief, *Charles S. Brody,* for the appellee (plaintiff).

BEACH, J. Upon the trial the plaintiff offered evidence tending to prove: That on May 2d, 1923, the defendants, respectively editor and publisher of "The Bridgeport," a newspaper published in the city of Bridgeport in the Hungarian language, falsely and maliciously published therein certain defamatory matter concerning the plaintiff, the meaning of which was that the plaintiff was a trouble maker, had endeavored to disrupt a public gathering, had wilfully interrupted an assembly of people who had met for a lawful purpose, had committed a breach of the peace and urged others to likewise violate the law, and had endeavored to foster and inculcate a hostile and unpatriotic spirit among the Hungarian residents of Bridgeport; that this paper had a large circulation in Bridgeport and vicinity, where the plaintiff, the agent of a life insurance company, had built up a valuable

clientele almost entirely among Hungarian residents of Bridgeport and enjoyed their respect and esteem for integrity and fair dealing, and that it circulated especially among those of Hungarian descent in Bridgeport and vicinity; that the defamatory publication had been read by many of his friends and prospective customers, and injured him in their estimation; and had caused him to be held up to ridicule and humiliation; had interfered with the plaintiff in the performance of his duties and had caused him untold annoyance, embarrassment and shame; whereby the plaintiff has suffered pecuniary loss in his business, and his good name and reputation have been greatly injured. Also that on May 4th, 1923, he requested the defendants in writing to retract said libelous charge in as public a manner as that in which it was made; and in response to this request the defendants, on May 26th, 1923, again published defamatory matter in the same paper, which, instead of being a retraction, added more defamatory and libelous matter to the defamation previously made, which was also false and malicious, and that they never retracted any of the charges.

The defendants offered evidence tending to prove that when they published the defamatory article on May 2d, 1923, they did so in good faith believing the matter to be true in all respects; that the source of the information was apparently reliable and justified their belief in its truth; that they published a retraction of such parts of the defamatory article as they admitted were false, within a reasonable time within which to make retraction; that the plaintiff did not enjoy a favorable reputation among the Hungarian residents of Bridgeport and suffered no pecuniary loss.

The defendants pleaded specially that the publications were true, but offered no evidence in support of

this defense, and also specially pleaded that they were conditionally privileged as conductors of a newspaper in publishing the alleged libelous statements.

The jury found all the issues for the plaintiff.

The defendants allege as a ground of appeal that the court erred in not submitting the question to the jury as to whether or not the publication was privileged. The court charged as to the special defense of conditional privilege as follows: "There is also added by the defendants a special defense wherein they set up that the defendants were, in what they did, acting in the exercise of what they call a conditional privilege. It is of course true that a newspaper does have certain rights in its discussion and accounts of certain matters, which permit it to go beyond the scope of the comment which perhaps would be justified between man and man; because newspapers are after all molders of public opinion, and without them a republic at least would not successfully move. That right, however, does not extend to permit it to deal with the acts or words of a private individual with any more freedom than would be allowed to a private individual, whether those acts or conduct take place in a public meeting or on a public street or anywhere else. So I say that there is here no case of conditional privilege at all; consequently the defendants' special defense may be laid out of your consideration."

The court herein correctly charged, in effect, that the defendants had offered no evidence which raised any question as to conditional privilege for the jury to determine. "The legal character of the occasion upon which these charges were made was a question for the court, but [if the occasion was determined by the court to be privileged] the character of the use which the defendant made of that occasion was a question for the jury." *Hassett* v. *Carroll*, 85 Conn. 23, 36, 81 Atl. 1013.

From the finding and claims of the plaintiff in argument, the damages sought to be recovered were for the most part what are known as general damages, such as his damaged reputation; his injured feelings; the humiliation, insult and disgrace to which he was subjected by the defendants' false charges, and the time, manner and language in which they were made, and for the expenses of his litigation less recoverable costs. *Hassett* v. *Carroll, supra.* The public gathering which the plaintiff was falsely accused of attempting to disrupt, was one at which Count Szechenyi, a representative of the Hungarian government in this country, was the principal speaker, and the charge was one which, if true, was calculated to justly bring the plaintiff into general disrepute among persons of Hungarian birth or descent. The defendants' newspaper in which the libelous matter was published was printed in the Hungarian language and had a circulation of about five thousand. The original libel, published May 2d, 1923, described the plaintiff as one of "those irreconcilable troublemakers who for many years have kept the Hungarian community of Bridgeport in constant fear," and who had abused their religious convictions and slandered their church and society officers. It charged the plaintiff and others with making Count Szechenyi the subject of an organized attack and stated that they had been chased out of the hall and beaten in an outburst of "long stored up bitterness."

On May 4th, the plaintiff made a written request for a retraction, which was followed on May 26th by humorous references to a threatened libel suit, accompanied with the statement that "little Mr. Monczport," "for greater glory," got his beating from the women and a somewhat cryptic reference to a threat of vengeance on the "fighting women," "when the Reds come." Finally, six weeks after the original libel, a

partial retraction was published admitting that the plaintiff behaved quietly at the meeting, but insisting that he made "an offensive remark concerning Hungarians of patriotic feelings," upon which the women fell upon the plaintiff and beat him. All the matters alleged were absolutely denied.

The jury found the issues for the plaintiff and awarded $5,000 damages. On a motion to set aside the verdict as excessive, the trial court directed that it be set aside unless within two weeks a *remittitur* of $2,500 was filed. This was done, and the only remaining question on this appeal is whether the verdict, as it now stands, is still so excessive as to require a new trial. While special damages were alleged, the testimony shows that the verdict was substantially for general damages only. As a verdict for general damages in libel it is not, so far as we know, equalled by any other in this State, except that in the *Hassett* case. In that case the libel charged a more serious offense, though it was not so widely published by the defendant, and it did not appear that the plaintiff had "seriously suffered in his reputation" or been brought into general disrepute. That case was decided in this court in December, 1911. Since then the value of a dollar as a unit of compensation in unliquidated damages, has substantially decreased, and the cost of litigation has substantially increased.

The plaintiff's business as district agent of an industrial insurance company brought him in repeated contact with many persons, among those most likely to be influenced by the libel; and there is abundant testimony that he suffered much humiliation, disgrace, and loss of reputation therefrom. There was also sufficient evidence of personal spite, to justify the assessment of such exemplary damages as our law permits; and deducting the estimated cost of litigation less taxable

costs from the verdict, the net balance remaining applicable to compensation for the tortious injury to reputation and character, is doubtless much less in purchasing power than were the damages in the *Hassett* case.

In the *Hassett* case the trial court refused to set aside the verdict, and in this court a new trial was ordered unless a *remittitur* was filed. In the instant case the situation is reversed, for the trial court has imposed a *remittitur,* and the damages now complained of as excessive are not those awarded by the jury, as the result of passion, ignorance, partiality or corruption; but in practical effect a revised assessment of damages made by the trial court in the exercise of a legal discretion.

In appeals from the action of a trial court in setting aside or refusing to set aside a verdict as excessive, this court reviews the action of the trial judge and not the action of the jury, except in so far as it may be necessary to do so. The judicial supervision which a presiding judge has over a verdict is an essential part of the jury system. It involves the exercise of a legal discretion, and the action of the trial court will not be reviewed unless it clearly appears that the discretion has been abused. In determining whether there has been such an abuse, great weight is due to the action of the trial court, and every reasonable presumption exists in favor of its correctness. These are familiar principles. See *Cables* v. *Bristol Water Co.,* 86 Conn. 223, 84 Atl. 928, and many cases there cited.

These principles seem to apply with peculiar force to the instant case, where the trial court has already scaled down the verdict by imposing a *remittitur.* A trial judge may sometimes allow a verdict to stand, though it is larger than any sum he would himself have awarded. But in this case the verdict as it now stands

represents a deliberate appraisal of compensatory damages made by an experienced trier who heard and saw the witnesses, and who was in a far better position than can be reached by reading the cold record, to estimate what amount of humiliation, disgrace and loss of reputation the plaintiff encountered, and what was his personal reaction to the assault upon his character.

There is no error.

In this opinion CURTIS, KEELER and HAINES, Js., concurred.

WHEELER, C. J. (dissenting.)  The motion to set aside the verdict as excessive should have been granted, or an order for a *remittitur* of $4,000 entered. Inasmuch as I am of opinion that the majority of the court are under a misapprehension as to the terms and extent of the libels charged, I quote them entire:

"THE ELORE SPORTS GET BEATEN UP AND KICKED OUT.

"The Disturbing, Trouble-seeking Figureheads Fail Shamefully at the Szechenyi Meeting of the Civic Club.

"Those irreconcilable troublemakers who for many years have kept the Hungarian community of Bridgeport in constant fear, failed shamefully on Sunday afternoon and received such a bitter lesson that they will not forget it very soon; the patience of the Hungarian community, and the bitterness which had been stored up in their hearts broke and mighty blows and kicks ended out, but every one of them fell upon the place which had long deserved it.

"The first interruption took place when Szechenyi started his speech on Sunday afternoon.  Some New York sport by the name of Mautner cut into his speech and a moment later he was being thrown out of the

place. The patriotic Hungarians rose up and carried him out, beating him and it was only the interference of the police which saved him from being lynched. Then the police arrested the young man.

"A few minutes later the New York Elore crowd again tried to disturb, but this time they were helped by their Bridgeport Coharts, John Gomdos, James Monczport and the rest, but they paid very bitterly for this because the patriotic public and audience became even more aggravated and speedily chased the whole crowd out of the hall with their blows, so that both the New Yorkers, and Gomdos and Monczport received a severe beating from the strong Hungarian fists. We regret this occurrence but we knew that sooner or later it would come.

"For years we have been giving notice that ideals cannot be successfully fostered by the use of mud-slaying slander. Every man has a right to follow and to uphold his own convictions and ideals, but he must do it decently and with proper respect for a contrary opinion and in a manly and courteous manner.

"But the Elore crowd did not do this.

"The Bridgeport Hungarian community has for many years endured patiently the abuse of their religious convictions, the slander of their church and society officers, and the attempt to place upon their necks, one or two figure heads who would have control of all their affairs, because they (The Elore crowd) wanted the whole Hungarian community to dance to the tune which they whistled.

"Such a senseless policy is always self-destructive and that is all they have been in Bridgeport on this occasion. These stupid people chose Szechenyi as the object of their attack, Szechenyi, whom the entire Hungarian community knows that he and his wife have been a veritable benefactor to the Hungarians in their

misery. It is sufficient to mention merely the episode of the loveship. The long stored up bitterness had burst forth at last and we believe that it will bring the Elore crowd to their senses. If it does not, we fear that there will be a continuation of the same occurrences."

On May 4th, 1923, plaintiff made demand in writing upon the defendant editor of "The Bridgeport" that the statement published in the issue of this paper of May 2d be retracted. No other demand for a retraction was ever made upon the corporation publishing this paper. On May 26th following, defendants published the following: "We shall whisper to the ear of the Testveriseg—but don't tell anyone about it! that it is true little Mr. Monczport really got it. And what's more, for a greater glory, he got it from the women when he was offending the Hungarians and, also it was a skirt that saved him from the more serious blows." On June 13th following, in response to a further demand for a retraction, defendants published a retraction of the libel so far as it related to plaintiff in its issue of May 4th, but reiterated the libel of May 26th: "But when James Monczport was starting out, after the meeting was over, he made while yet in the hall an offensive remark concerning Hungarians of patriotic feelings; at this, women that were near him fell upon him and in front of Rakoczi Hall gave him a good scolding and even hurt him." Assuming that both statements are libels, the defendants are responsible for both libels, which amount to this. The first charges that at a public meeting of Hungarians at which Count Szechenyi spoke, the New York Elore crowd again tried to disturb the meeting, and this time they were helped by Monczport, and all were chased by the patriotic audience from the hall with their blows, and he received a severe beating

from strong Hungarian fists. The second charges that as he was leaving the hall he made an offensive remark concerning Hungarians of patriotic feelings, and thereupon the women near him gave him a good scolding and even hurt him.

Plaintiff claims, and the majority find from the evidence, that defendants meant by these libels that the plaintiff was a trouble-maker; had endeavored to disrupt a public gathering; had wilfully interrupted an assembly of people who had met for a lawful purpose; had committed a breach of the peace and had urged others to likewise violate the law. The greater part of the libelous article of May 4th has no relation to the plaintiff. The libels cannot, we think, be held, so far as they relate to plaintiff, to mean that defendants meant that the plaintiff was a trouble-maker, or meant that he had urged others to commit a breach of the peace at this meeting. Nor does the evidence justify the attaching of these meanings to him. The libels upon plaintiff were unwarranted attacks upon a man of good character. They caused him no pecuniary damage. Neither his physical nor mental health was impaired by them. No injury to his social position was shown. The proof of special damage was limited at most to the loss of one policy amounting to $20. His earnings from his business have not decreased. The jury were entitled to award exemplary damages for the expenses of the litigation less the recoverable costs. No evidence was offered as to these. The case was a short one. The maximum allowance for these expenses could not exceed $300. Aside from these the general damages are by the evidence confined to plaintiff's damaged reputation, his injured feelings, and the humiliation, insult and disgrace to which he was subjected by the defendants' false charges. So that for the general damages, exclusive of the exemplary

damages, the jury assessed substantially the sum of $4,700. These general damages could only be awarded for compensation and not as punishment to defendants. The libel was not of an atrocious or serious character. No judgment for a substantial sum for a libel appears in our reports where the libel was not more reprehensible than in this case. Its reiteration was its chiefest wrong.

The sum awarded for general damage was perversely excessive. The trial judge so thought, for he says in his memorandum on the motion to set aside the verdict: "The situation developed and the personalities of the leading characters might naturally arouse a desire to award damages which would be punitive—in the usual, not the legal, sense—rather than compensatory. In fact, I must confess to the same feeling and would gladly uphold the verdict, if I might properly do so, for a larger sum than the largest which I consider the jury might reasonably have reached upon the evidence." And thereupon the court directed that the verdict be set aside as excessive, unless the plaintiff should, within two weeks, file a *remittitur* in the amount of $2,500. The result was to leave the damages at $2,500; $300 of this was for exemplary damages, the remainder, $2,200, exclusive of the $20 special damages, must have been compensation for such remaining general damage as had been proved. All the damages which could be awarded in this case were compensatory. Exemplary damages with us are in reality indemnification for the injury, and a part of the general or compensatory damages. *Craney* v. *Donovan,* 92 Conn. 236, 102 Atl. 640. The damages assessed in this case by the jury exceed any allowed for general damages in our reports. In *Hassett* v. *Carroll,* 85 Conn. 23, 81 Atl. 1013, the damages allowed to stand on *remittitur* were the same as those permitted to stand in this case.

But a reading of the libel in the *Hassett* case will disclose that it was a most venomous and atrocious attack by a priest of the Roman Catholic church upon one of his parishioners and a public official, repeated at each of three masses on a Sunday. Between that libel and this there is no comparison. The general damage to a Catholic through such an attack by a Catholic priest could not help but be large and we so recognized. We there took into consideration not only the language used, but the time, place, manner and other circumstances attending the preparation and publication of the defamatory matter.

The damages awarded the plaintiff were grossly excessive, and those permitted by the trial court to stand are also greatly excessive. The trail court ought either to have granted a new trial or ordered a *remittitur* very much larger than it did. In a case of this character, the court ought to make due allowance for the excitable nature of the parties engaged in this controversy. The award, $2,500, for such a libel is oppressive in the extreme to this editor, as well as to this semi-weekly newspaper of a circulation of five thousand. The jury, quite obviously, failed to understand that the general damages must be compensatory and not punitive. I am of the opinion that justice will be best served by granting a new trial.