ALEXANDER SANDORA *vs.* THE TIMES COMPANY.
JULIA PRANNO *vs.* THE TIMES COMPANY.

Third Judicial District, New Haven, June Term, 1931.
MALTBIE, C. J., HAINES, HINMAN, BANKS and AVERY, Js.

Argued June 3d—decided July 29th, 1931.

*Benjamin Slade* and *Alphonse C. Fasano,* for the appellant (defendant).

*David M. Reilly* and *Morris Rabinowitz,* for the appellees (plaintiffs).

AVERY, J.   These cases were tried together on motion of the defendant, and the plaintiffs claimed to have proved the following facts: February 26th, 1930, and for about three years prior thereto, the plaintiff Alexander Sandora, a man of the age of forty-three years, of good reputation, was living with his wife and their eight children in the town of Woodbridge, in a house owned by his sister, Maria DeMattie.  His mother, Margaret Sandora, lived with him, and the plaintiff Julia Pranno, a daughter of Mrs. DeMattie, lived with her mother in the same house.  Sandora's occupation was that of a farmer.  The plaintiff's mother, Margaret Sandora, was of the age of ninety years, and had been living with him for twenty-three years.  On the morning of February 18th, 1930, Constable William H. Tompkins, of Woodbridge, found her on the road a short distance from Sandora's home. She was in a sitting position, and thinking something was wrong with her, the constable went to the home of the plaintiff, and talked to him and his niece, Julia

Pranno. The constable and Julia Pranno then went to where Margaret Sandora was on the road. Later, the constable telephoned for an ambulance, and on its arrival, it was discovered she had a fractured leg. The ambulance carried her to the yard of the plaintiff's home, and thereafter she was taken to the hospital.

February 18th, 1930, the plaintiff Sandora was in poor physical condition with an injured leg and but one eye, having been injured three years previously in an explosion in a stone quarry where he worked; and was still receiving compensation at the rate of $8 per week for his injuries. The roads on that day were in a very icy condition.

February 25th, 1930, Margaret Sandora died at the hospital. On the same day, the Home Edition of defendant's newspaper, on the front page, in large and heavy black type, each letter one inch in height, had the following: *"Investigate death of aged woman."* Below appeared a recital of the fact that plaintiff's mother had broken her leg and died; and that officials were investigating the case; and it stated that Mrs. Sandora had a fight with her son. On the following day, February 26th, 1930, the defendant's newspaper published the following article:

"WILL QUIZ RELATIVES ON SANDORA DEATH.

"Coroner calls witnesses for hearing at County Building tomorrow.

"While Medical Examiner Marvin Scarborough prepared today to obey orders of Coroner James J. Corrigan to perform an autopsy on the body of Margaret Sandora, ninety, who died Monday night in Grace Hospital, the Coroner himself took further action in the case by ordering witnesses in the case into his office for a hearing. The time for this hearing has been set at three o'clock tomorrow afternoon.

"Meanwhile Woodbridge authorities and the humane officers of this city have started an investigation into the situation at the Sandora home on Newton Road in Woodbridge.

"Mrs. Sandora died after five days' suffering in Grace Hospital where she was taken last week after she had been found lying in the road on Newton Road by Constable W. H. Tompkins. The woman was suffering from exposure and a broken leg, and investigation at the time revealed that she had either left her home or been ordered out after a fight with her son Louis.

"Because of the circumstances of the case, a double investigation was launched immediately after her death. The Coroner began a search for details, and ordered the body held for autopsy, while Woodbridge officials began a probe into the living conditions in the Sandora household.

"This latter investigation so far has unearthed what appears to be a strange and unnatural situation. In the house where the old lady lived, lived also her son, eight children of his, the oldest being fourteen years and the youngest two; Mrs. Julia Pranno, a niece of Sandora's, and a Mrs. DeMattie, owner of the house.

"It is the assertion of the Woodbridge authorities that at least two of the children in the house are Sandora's by his niece. The whereabouts of his wife is not known, nor do the officials know where Mrs. Pranno's husband is living.

"Whether Sandora will be held responsible for his mother's death remains uncertain. It is positively known that he refused to go to her aid after she was found in the roadway, and refused also to be responsible for her after she was taken to the hospital.

"Either one of three other brothers may claim the body if Louis, with whom the old lady lived for

twenty-three years, fails to do so. The brothers are Peter, who lives on Wallace Street; Ralph, who lives on Whalley Avenue, and Dominick, of Pease Road, Woodbridge."

This article appeared in the city edition on the front page in large type headings, together with a photograph of the plaintiff Sandora, and another photograph of his home. The "Louis Sandora" mentioned in the publication, and whose picture appeared therein, is the plaintiff, whose correct name is Alexander Sandora. The Julia Pranno mentioned is the other plaintiff.

These facts were not controverted at the trial by the defendant, and the publication of the article in question was admitted in the pleadings. The truth of the publication was not set up in the answer; and, at the trial, no evidence was offered in any way tending to show any immoral relations between the plaintiff Sandora and the plaintiff Julia Pranno. The evidence offered by the defendant was in support of the contention that the article was published in good faith, relying upon information claimed to have been obtained by its reporters from the wife of Constable Tompkins and from Clarence F. Baldwin, the first selectman of Woodbridge. That any such information had been given to defendant's reporters was denied by witnesses called by the plaintiffs; and whether or not such information had in fact been obtained, was a matter in dispute in the evidence. The defendant also claimed that none of its officers or agents had any actual ill will or hostile feeling toward either of the plaintiffs. The defendant further claimed that the article was published by it as a matter of public interest; and, at the trial, the whole controversy between the parties turned upon the question of whether or not the article was published

by the defendant in good faith and with proper motives, or whether the publication was actuated by improper motives, with such indifference to its effect upon the rights and reputations of the plaintiffs as to constitute "malice in fact." The jury brought in a verdict in favor of the plaintiff Alexander Sandora for $3250; and in favor of Julia Pranno for $4250. These verdicts were accepted by the court, and judgment entered thereon; and the defendant appealed, assigning as error the failure of the court to charge in accordance with certain requests of the defendant, and also certain claimed errors in the charge as delivered. Error is also assigned in the refusal of the trial court to set aside the verdict, and in certain rulings upon evidence.

The first five assignments of error are predicated upon the refusal of the trial court to charge the jury in accordance with requests of the defendant. The first four requests involve statements of law generally on the subject of libel, and the fifth involves a statement as to the burden of proof upon the question of malice. All these requests are sufficiently covered in the charge as delivered. "The court is not required to use the language, often prolix and largely argumentative, . . . with which a party clothes a pertinent request to charge." *Daniels* v. *Grand 5, 10 and 25-Cent Stores, Inc.*, 99 Conn. 415, 417, 121 Atl. 804. It is sufficient and usually desirable to incorporate in its own arrangement of a charge, the pertinent requests of a party. *Roth* v. *Chatlos*, 97 Conn. 282, 286, 116 Atl. 332.

The next six assignments of error are predicated upon extracts taken out of the charge, and evidently arise from misapprehension of counsel as to the meaning of the term "malice in fact" as contained in § 5668 of the General Statutes. The charge upon this phase

of the case was adapted to the issues and in conformity with our law. *Atwater* v. *Morning News Co.*, 67 Conn. 504, 517, 34 Atl. 865; *Moore* v. *Stevenson*, 27 Conn. 13, 28; *Hotchkiss* v. *Porter*, 30 Conn. 414, 423; *Wynne* v. *Parsons*, 57 Conn. 73, 78, 17 Atl. 362; *Osborne* v. *Troup*, 60 Conn. 485, 494, 23 Atl. 157; *Hassett* v. *Carroll*, 85 Conn. 23, 36, 81 Atl. 1013; *Corsello* v. *Emerson Brothers, Inc.*, 106 Conn. 127, 132, 137 Atl. 390.*

---

* The charge of the court upon this subject was as follows: "The words complained of charge these two plaintiffs with the crimes of adultery and incest, as well as being the parents of two illegitimate children. A charge of a person having committed a crime is libelous *per se,* from which the law presumes damage without special proof to that effect on the part of the plaintiff. The defendant, however, sets up as a defense what is known as a claim of privilege. I do not mean that that is specifically alleged. It is not necessary that it be so. It can be raised under the general denial, and whether or not this publication was privileged is a question of fact for you to decide and is really the main issue over which the parties are in controversy.

"The Constitution of this State contains the following provisions:

"Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty.

"It is upon the latter part of this section that most of the rules relating to libel arise; that is, being responsible for the abuse of that liberty. The determination of this question is concerned with two important rights; that of the individual to reparation for malicious injury to his reputation, and that of the people to liberty of speech and of the press. These two rights are not inconsistent, but inter-dependent. The individual has no right to demand reparation for those accidental injuries incident to organized society. Freedom of the press is the offspring of the law, not of lawlessness, and its primary meaning excludes the idea of malicious injury. Indeed any true freedom of the press becomes impossible where malicious injuries are not forbidden and punished, and the strongest guaranty of that freedom lies in an impartial administration of the law which distinguishes the performance of a public and ordinary social duty from the infliction of malicious injury.

"Applying this reasoning to the facts of this case, we find that

Three assignments of error are based upon the instructions of the court upon the question of damages. Upon this subject the court followed the rule laid down by HALL, C. J., in *Hassett* v. *Carroll*, 85 Conn. 23, 37, 81 Atl. 1013, to the effect that the damages recoverable are limited to a sum sufficient to compensate the plaintiff for those injuries which the law presumes as a natural and proximate result of the publication; *Wynne* v. *Parsons*, 57 Conn. 73, 78, 17

the defendant claims that the article was published in its newspaper in good faith, believing all of the facts stated in such publication to be true. This gives rise to an occasion of privilege, and throws on the plaintiff the burden of proving, by a fair preponderance of the evidence, malice in fact.

"This question is one that is not always easy to understand. Ordinarily, when a false and defamatory statement is made in writing about another and is published, it carries with it the presumption that the statement is maliciously made, and malice is presumed from the mere making of the statement, but when there is an occasion of privilege as here, the presumption is different, and although the statement may be false, it is necessary for the plaintiff to show by a fair preponderance of the evidence that there was malice in fact in making it. We have a statute in this State which applies to this rule, reading as follows:

"'In any action for a libel, the defendant may give proof of intention, and unless the plaintiff shall prove either malice in fact, or that the defendant, after having been requested by him in writing to retract the libelous charge in as public a manner as that in which it was made, fails to do so within a reasonable time, he shall recover nothing but such actual damage as he may have specially alleged and proved.'

"So that you will observe that, under this statute, the plaintiffs must, by a fair preponderance of the evidence, prove malice in fact or they can recover nothing, as they neither requested a retraction nor have alleged any special damage. This statute which I have just read to you was enacted in the interest of publishers of newspapers. It intended to furnish them a measure of protection in the publication of current news, criticisms upon public men, and comments upon matters of public interest. It placed such publication upon the same plane with privileged communications in this respect, that, under proper pleadings, the defendant was allowed to prove, in justification, that the publication was intended merely as an item of news, or of fair and just

Atl. 362; such as his damaged reputation; his injured feelings; the humiliation, insult and disgrace to which he was subjected by the defendant's false charges, in view of the time, manner and language in which they were made; and for his expenses of litigation, less the recoverable costs. *Noxon* v. *Remington,* 78 Conn. 296, 61 Atl. 963; Newell on Slander and Libel (2d Ed.) 424, 864.

Error is assigned in the refusal of the court to set aside the verdicts on the ground that the damages are excessive. The amount of damages in such cases rests, to a great extent, in the discretion of the jury. *Hassett* v. *Carroll,* 85 Conn. 23, 38, 81 Atl. 1013; *Woodruff* v. *Richardson,* 20 Conn. 238, 243. It seems quite likely that the item of $250 on each verdict, in view of the evidence, was awarded by the jury as punitive damages, being the amount testified to as the expense of litigation in each case, which leaves the amount of general damages awarded to the plaintiff Sandora

criticism upon men and measures, and if he could make such proof, it should rebut the presumption of malice raised by the law from the publication of a false and defamatory article, and put upon the plaintiff the burden of proving, by other and additional evidence, an improper and unjustifiable motive.

"This expression 'malice in fact,' however, does not necessarily mean hatred, spite or ill-will against the plaintiffs, but that there must have been some improper or unjustifiable motive in publishing the article. The defendant must have been actuated from some other motive than a bona fide intention of printing an article merely as news in which it believed the public was interested. It is not for the defendant to establish any want of such improper motive on his part. The burden is upon the plaintiffs to establish by a fair preponderance of the evidence such improper or unjustifiable motive on the part of the defendant, and unless the plaintiff has, by such preponderance of evidence, established such improper or unjustifiable motive, your verdict should be for the defendant. If, however, you find that such improper or unjustifiable motive has been established, then you are justified in finding that malice in fact existed, in which event your verdict should be for the plaintiffs."

$3000, and to the plaintiff Julia Pranno $4000. In view of the wide publicity given to this charge by the prominent way in which it was displayed in the defendant newspaper, as well as the outrageous character of the libel itself, taking into consideration all the circumstances of the case, the trial court did not err in refusing to set aside the verdict.

It remains to consider the assignments based upon rulings on evidence. The questions propounded to the two plaintiffs by their counsel to bring out the actual fact concerning the injury to the mother of Sandora and their conduct and attitude to her were clearly admissible. It is true that the defendant did not put in issue the truth of the charges made. But it would be a grievous situation and one we cannot sanction that a defendant, by failing to make an issue of the truth of a libel, could put it out of the power of the injured party to prove that the charges were false.

The plaintiffs called Avery D. Toohey, city editor of the defendant's newspaper, who testified that the story had been brought to him by a reporter, that he had passed on it and that he investigated to the extent of asking the reporter certain questions about it. The defendant, in cross-examining the witness, asked, "Did you report in your paper the result of that investigation?" This question was excluded as not germane to the direct examination, and it does not appear that it was.

The question asked of the defendant's reporter who wrote the article, "Have you ever had occasion as a newspaper reporter to disbelieve men, such as first selectmen in towns, on information which was given to you by them?" was properly excluded. If belief in the integrity of the reporter's sources of information was relevant at all, it would be belief in that of the particular informant who gave him the statement in

question. The defendant's city editor was asked, on redirect, "Would it be possible—physically possible— for a city editor to run a newspaper and check the stories that come to it?" Exclusion of this is assigned as erroneous but, framed as broadly as it was, it was irrelevant to the issue in the present case, which involved a story containing statements which were libelous *per se* exposing the defendant to liability if published with malice. A measure of investigation, as to the facts, which would be appropriate and reasonable as to the general run of newspaper articles, not potentially libelous, including regard to the physical limitations applying thereto, affords no criterion of the duty attaching to publication of an article such as that here in question, which the conductors of the newspaper are presumed to know in effect attacks the character and reputation of individuals and may not be published recklessly or without reasonable investigation if the publisher is to be absolved from malice in so doing. *Osborne* v. *Troup*, 60 Conn. 485, 23 Atl. 157.

The same witness, having testified that in the past he had relied upon the information obtained by his reporters, was asked, "And have you always in the past found that reliable?" After answer, "I have" had been given, objection was made and sustained, but it does not appear that the answer was stricken out or withdrawn from consideration by the jury. Even if the exclusion had been effectuated, it would not have been erroneous for the same reason as stated in connection with the reason of appeal last above discussed. The same witness, under cross-examination, was asked whether, because the person involved was a poor Italian girl, he decided that it was not important enough to investigate further and take Hislop's story; and, over objection, answered, "Yes." Thereafter,

asked if a person of greater prominence had been involved he would not have done something more, he replied, "It would depend entirely upon who the person was." These questions tended to show an indifference to the rights of the plaintiff in the publication of the article, and were thus relevant upon the question of malicious intent.

Constable Tompkins was a witness for the defendant. He had, after the publication, given testimony at a coroner's hearing concerning circumstances surrounding the finding of Mrs. Sandora in the roadway, and the conduct of the plaintiff, Sandora, toward his mother. The finding is that he testified concerning these matters fully and clearly without hostility or any sign of failure to recollect events. The defendant offered to refresh his memory by asking if he had not made certain statements to the coroner differing from those made on the witness stand; and, later, offered a transcript of the evidence taken before the coroner. The court, on objection by the plaintiff, did not permit the witness to be interrogated as to what he had said in the hearing before the coroner, and refused to admit in evidence a transcript of the testimony taken at the hearing. It was within the discretion of the trial court, having the witness before it, to determine whether and how far counsel for the party who had called the witness might examine him as to alleged inconsistent statements. A party who is surprised by the adverse testimony of his own witness, although voluntarily called, may be permitted to examine him for the purpose of showing that he has made statements contradictory to his testimony upon the stand. Such examination is, however, a privilege and not a matter of right, and error cannot be predicated upon its refusal. *Carpenter's Appeal*, 74 Conn. 431, 436, 51 Atl. 126; *Conklin* v. *John Howard Industrial*

*Homes,* 224 Mass. 222, 225, 112 N. E. 606. The transcript of evidence taken before the coroner was not admissible under the circumstances of the offer.

. The defendant offered evidence, as bearing upon the good faith of the publication, tending to prove that the plaintiff did not attend his mother's funeral. Under these circumstances, in rebuttal, the plaintiff was entitled to offer evidence that he did. The ruling of the court admitting expert evidence as to the expense of the trial, was in accordance with our suggestion in *Craney* v. *Donovan,* 95 Conn. 482, 484, 111 Atl. 796. The other rulings on evidence do not require discussion.

There is no error.

In this opinion the other judges concurred.