Lawrence **HOGAN** and **Thomas Maloney**,
Plaintiffs,

v.

**NEW YORK TIMES COMPANY**,
Defendant.

Civ. No. 7647.

United States District Court
D. Connecticut.

July 19, 1962.

Donald F. Zezima and Ronald M. Schwartz, of Macrides, Zezima & Schwartz, Stamford, Conn., for plaintiffs.

Frank E. Callahan and Thew Wright, Jr., of Wiggin & Dana, New Haven, Conn., for defendant.

TIMBERS, District Judge.

Defendant moves, pursuant to Rule 50(b), Fed.R.Civ.P., to set aside the verdict and judgment entered thereon, for entry of judgment in accordance with defendant's motion for a directed verdict, or, in the alternative, for a new trial.

Plaintiffs, police officers of the City of Stamford, sued defendant for libel based upon a New York Times front page article published October 4, 1958 concerning plaintiffs in the performance of their official duties as police officers.

The article described a night raid conducted by six policemen, including plaintiffs, on a street corner dice game in Stamford; use of a florist's truck as a decoy by the policemen to surprise the dice players; loading into the rear of the truck the arrested players, some of whom thereupon emerged from the front of the truck and attempted to escape; swinging of night sticks, during the course of which plaintiff Maloney was said to have struck plaintiff Hogan who, according to the story, slumped to the pavement with a badly bruised head; apprehension and booking at police headquarters of only four of the ten dice players; and loss of four of the police night sticks in the scramble. The raid was described as following the script of a Keystone Comedy.

Defendant admitted publishing the article complained of; denied that it was

false; denied the alleged innuendoes; denied plaintiffs' claims of damage; and alleged affirmatively that the article "described a matter of public interest, was published in the defendant's newspaper in the course of the defendant's business of disseminating the news and as such was privileged."

■ Jurisdiction is based on diversity of citizenship,[1] plaintiffs being citizens of Connecticut and defendant a citizen of New York. The amounts in controversy, in the case of each plaintiff, exceed $10,000, exclusive of interest and costs.

After a five day trial, the jury returned a $6,020 verdict in favor of plaintiff Hogan ($5,000 general damages, $20 special damages and $1,000 exemplary damages) and a $6,125 verdict in favor of plaintiff Maloney ($5,000 general damages, $125 special damages and $1,000 exemplary damages).

By the instant motion, defendant raises questions as to the propriety of the Court's failure to direct a verdict for defendant and as to the propriety of the Court's charge to the jury, particularly with respect to the Court's outlining the essential elements of the case.[2]

The Court charged in substance (1) that publication by defendant of an article concerning plaintiffs was admitted by the pleadings; (2) that the publication was libelous per se as a matter of law; (3) that, with respect to the question of privilege, (a) the article was published on an occasion of privilege as a matter of law, but (b) whether that privilege had been abused was a question of fact for jury determination; and (4) that whether plaintiffs had been damaged and, if so, the amounts of general, special and exemplary damages, were questions of fact for jury deter-

mination. As part of the charge on damages, over objection by plaintiffs, the Court charged as a matter of law that the retraction, requested by plaintiffs two and one-half months after the publication, was not timely; accordingly, in order to recover general damages, as distinguished from special damages, plaintiffs were required to prove malice in fact.[3]

Defendant's claims of error, preserved by timely requests to charge and exceptions to the charge, are directed chiefly at the Court's charging that the publication was libelous per se as a matter of law and the instructions regarding malice in fact (i) within the meaning of the statute limiting recovery, absent a timely request for retraction, to special damages unless malice in fact is shown and (ii) for the purpose of establishing an abuse of the occasion of privilege.

The Court denies defendant's motion. An order has been entered accordingly.

■ The reasons for denying the motion are reflected in the annotations to the charge hereinafter set forth, it being the belief of the Court that the portions of the charge challenged by defendant can best be evaluated in the context of the charge as a whole and in the light of the authorities upon which the Court relied.

■ It is a courthouse canard that a jury charge is intended more for appellate eyes than for jury ears. Not so with this charge. Colloquial in form, it was intended primarily as a guide for the jury. In a state where trials of libel actions have resulted all too frequently in hung juries, the Court considered it to be its duty, by eliminating from jury consideration issues which properly should

---

1. This being a diversity case, the controlling substantive law is that of Connecticut. Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

2. The Court charged the jury that the essential elements of the case are reflected in four basic questions to be answered:

(1) Was there a publication by defendant of an article concerning plaintiffs?
(2) Was the publication libelous?
(3) Was the publication privileged?
(4) Were plaintiffs damaged by the publication and, if so, in what amounts?

3. Conn.Gen.Stat. § 52–237 (1958).

be determined as a matter of law, to enable the jury to focus on those critical questions of fact which plainly were for jury determination. Hence, over objection by plaintiffs, the Court instructed the jury as a matter of law that the article was published on an occasion of privilege and that the tardy retraction requested by plaintiffs was ineffective to relieve them of the necessity of proving malice in fact if they were to recover anything but special damages. On the other hand, over objection by defendant, the Court instructed the jury as a matter of law that the publication was libelous per se. That left for jury determination the critical questions of whether defendant had abused its privilege and whether plaintiffs had been damaged.[4]

The Court's charge to the jury, annotated to indicate the authorities relied upon, was as follows.[5]

## COURT'S CHARGE TO THE JURY

### I

### FUNCTION OF COURT AND JURY

THE COURT: Ladies and gentlemen, we have now reached the point in this case where it becomes our joint function, as ministers of justice in the truest sense, to perform our respective duties; your duty as judges of the facts, my duty as judge of the law.

I shall endeavor to the best of my ability to instruct you with respect to the applicable principles of law which you in turn are to apply to the facts as you find them. I will not in any way, shape, or form seek to usurp your function as judges of the facts. While I may comment on the evidence, or make reference to it as we go along, please bear in mind, as I have indicated throughout, that that is your sole and exclusive province, to decide the ultimate facts in this case.

By the same token, I must deferentially and respectfully ask you to take the law from the Court, not to conjecture what it is or what it should be, or anything of the sort. That is the system of government under which we operate, and I am sure that there will be no reservations in your minds on that score.

### II

### NATURE OF CASE

Now, this case is, as counsel—and, able counsel on both sides—have referred to it, a libel action. It is in the general category of tort litigation, a tort action. In other words, it is in the same category as automobile collision cases or cases of that sort. But, it is entirely different, as you can quickly see, in that the harm claimed to have been done in the nature of the tort, which is the libel, the alleged libel, does not take the form of physical contact, physical impact by one party on another, or a mechanism on another. It is a matter of the effect of spoken words —written words, rather, in a libel action —spoken words being in a slander action.

The law which I am about to try to compress into a nutshell for your guidance in deciding this case is the result of many, many years—indeed centuries

---

4. It has been settled law in Connecticut for many years that whether a publication was libelous per se and whether it was published on an occasion of privilege, are questions of law for determination by the court; and that whether the privilege was abused, is a question of fact for determination by the jury. The Supreme Court of Errors nearly a half century ago, in Flanagan v. McLane, 87 Conn., 220, 222, 87 A. 727, 728 (1913), stated:

"Whether a publication is libelous *per se* is a question for the court. Donaghue v. Gaffy, 54 Conn. 257, 266, 7 Atl. 552. Whether the occasion is one of privilege is also a question of law for the court. Atwater v. Morning News Co., 67 Conn. 504, 513, 34 Atl. 865; Hassett v. Carroll, 85 Conn. 23, 36, 81 Atl. 1013. Whether the defendant in the use of the privileged occasion was or was not actuated by malice in fact is a question for the jury. Donaghue v. Gaffy; Atwater v. Morning News Co.; Hassett v. Carroll, supra."

5. The charge as given to the jury of course did not include the annotations.

—of the development of the law of libel which has come down to us from across the sea, which was well-established long before our little colony of Connecticut was organized and ultimately became a state.

So, what I am about to outline to you, I simply say parenthetically, is not my idea of what the law should be necessarily, nor is it anything that's been fashioned for the particular purpose of this particular case. These are legal principles deeply-seated in the law.

## III

## FUNDAMENTAL INTERESTS INVOLVED

You can appreciate, I think, when you see what is involved here, trying to view it objectively and dispassionately as each of you will of course, that there is involved at the core of this case a fundamental conflict between two competing interests.

One, the interest of the individual and his right to remain undamaged in his reputation in the community as a result of any libelous statements with reference to him. That is a fundamental right which inures to the benefit of each of us.

On the other hand, there is an equally fundamental principle involved with the other competing interest, the right of a free press to carry on its business in an orderly fashion, in a business-like way, and to disseminate the news and to publish and circulate that news without fear or restraint so far as reporting accurately, fearlessly, and completely; particularly with respect to the conduct of public officials and officers of the law, as in the case of these two plaintiffs.

So, you have in that framework in this case the clash of two fundamental interests. It is vital that we as jurors and judges in our attempt to resolve this controversy have in mind that both of these competing interests are equally precious to our democratic form of government and society in this country.

## IV

## SUMMARY OF PLEADINGS

Now, in short, in this case, the plaintiffs are Lawrence Hogan and Thomas Maloney of Stamford, Connecticut, both members of the Police Department in the City of Stamford. They charge the defendant, the New York Times, with having published and circulated an article, defamatory, about them, and having published it on October 4th, as I recall, 1958, and as a result of which Mr. Hogan and Mr. Maloney have offered proof that they have been injured in the various respects that you recall, and which I shall not detail, because as I understand it, it is not controverted—there has been no controverting testimony with respect to their claims of injury, anguish, ridicule, and so forth.

The defendant does say in its answer—and incidentally, both the complaint and the answer will be in your hands in the jury room so that you may examine them in more detail—but, in short, the defendant admits that it published the article in substantially the form alleged in the complaint. There is no dispute about the contents of the publication, nor is there any dispute that it related to these two plaintiffs and, in fact, referred to them by name. Defendant admits that the publication was widely circulated. What it denies, among other things, is that the publication, viewed as a whole, was false. In other words, defendant denies the allegation that it was a false and defamatory statement.

The defendant also says, by way of special defense, that the publication referred to described a matter of public interest, was published in defendant's newspaper in the course of defendant's business of disseminating the news and, as such, was privileged. I shall spend a little more time with you ladies and gentlemen on the subject of privilege later.

## V

## ESSENTIAL ELEMENTS OF CASE

Now, what are the essential ingredients of this case—the basic elements of the case, stripped, if I may put it that way, to the bone? I think that for the purpose of getting down to the substance of the case and putting it into form so that you ladies and gentlemen can most easily analyze the evidence, I shall put it in the form of four questions, the essential elements of this case.

### (1) Was There A Publication By Defendant Of An Article Concerning Plaintiffs?

The first question is: Was there a publication by the defendant of an article concerning the plaintiffs?

You need not bother yourselves with that question. It has already been answered. The defendant has admitted in its answer that there was a publication by the defendant concerning the plaintiffs. So, the first element of the case you make take as established by the pleadings.

### (2) Was The Publication Libelous?

The second question, which normally you would be required to determine in any libel case, is, was the article, which was thus published, libelous in character?

■■ Under our law, the publication referred to would be libelous per se, that is, libelous within the meaning of those words themselves on the face of the publication, if it was written concerning the plaintiffs in connection with their calling as police officers, and if the publication was of such a nature as to charge the plaintiffs with an act or acts reflecting some defect of character, or lack of knowledge, skill, or capacity, such as necessarily would affect their competency successfully to discharge their duties as police officers. Put another way, written words are libelous per se—in and of themselves—if they charge only a single act, provided that act is something derogatory to the plaintiff in the operation of his business, or in the practice of his profession, and if the charge is of such a nature that it is likely to injure the plaintiff in that business or profession.[6]

■ Under our law, when a libel is expressed in clear and unambiguous terms, it is the duty of the Court to declare it to be a libel per se.[7]

I might say, parenthetically, the reverse is true: it also is the duty of the Court to rule, as a matter of law, if an

---

6. Restatement, Torts § 569, comment e, at 168 (1938); 1 Harper & James, Torts § 5.12, at 381–386 (1956). Libel per se is of two sorts: a libel which charges a person with a crime involving moral turpitude; and a libel which injures a person in his profession or calling. Since the libel here alleged does not charge the police officers with a crime, the question is whether it is the latter type of libel per se.

To constitute such libel per se the words must be written of the police officers in connection with their calling, or the words must be of such a nature as to charge them with an act reflecting some defect of character or lack of knowledge, skill or capacity as necessarily to affect their competency successfully to carry on their business or trade or profession. Spoken words to be actionable must charge general incompetence of some sort. "Written words

\* \* \* are libelous per se if they charge only a single act, provided that act is something derogatory to the plaintiff in the operation of his business or in the practice of his profession \* \* \* and if the charge is of such a nature that it is likely to injure the plaintiff in that business or profession." Proto v. Bridgeport Herald Corp., 136 Conn. 557, 567, 72 A.2d 820, 826 (1950); Petrucelli v. Catapano, 107 Conn. 122, 123, 139 A. 634, 635 (1927). See Corsello v. Emerson Bros., Inc., 106 Conn. 127, 130–131, 137 A. 390, 392 (1927).

7. Charles Parker Co. v. Silver City Crystal Co., 142 Conn. 605, 612, 116 A.2d 440, 443–444 (1955); Proto v. Bridgeport Herald Corp., supra note 6, at 565, 72 A.2d at 825; Carey v. Woodruff, 89 Conn. 304, 308, 94 A. 281, 282 (1915); Flanagan v. McLane, supra note 4, at 222, 87 A. at 728; Donaghue v. Gaffy, 54 Conn. 257, 266, 7 A. 552, 554–555 (1886).

---

Content:

---

alleged libelous statement is not libelous per se.[8]

It is one of my functions in this case, and I have ruled, and accordingly I charge you ladies and gentlemen as a matter of law, that the publication here in question was libelous per se. It, therefore, will be unnecessary for you to determine this second question propounded, namely, whether the publication was libelous.

So, the first two of the four elements in this case, in effect, you may, and you are required to, take as having been established: first, the publication, secondly, that the publication was libelous per se.

### (3) Was The Publication Privileged?

The third question—and here is where we come to the area where you are going to have to discharge your functions as to the facts—the third question is: Was the publication privileged?

Here, there are two subordinate questions to be determined, one by the Court and the other by the jury.

### (a) Was The Article Published On An Occasion of Privilege?

The first subordinate question which has been determined by the Court is: Was the occasion of publication privileged? That is, was this newspaper article in the New York Times published on an occasion which makes it privileged as claimed by the defendant in its answer?

A newspaper reports the activities of public officials, including police officers acting within the scope of their employment, as an occasion of privilege. Accordingly, I charge you as a matter of law [9] that the publication here in question was published on an occasion of privilege.[10]

### (b) Was The Privilege Abused?

The second subordinate question under this main heading, "Was the publication privileged?"—and this is one of the questions, and one of the key questions I'll be candid to say, for your determination—is: Was this privilege abused? This is a question of fact for determination by you ladies and gentlemen of the jury.[11] On your determination of this question in part, indeed in large measure, will be determined the ultimate verdict in this case.

In view of the public interest involved in the publication by newspapers of acts of public officials, newspapers are granted a so-called conditional privilege to report such acts.[12] This means, in short, that newspapers in reporting such matters of public interest must not abuse the privilege.

The Constitution of the State of Connecticut provides that "Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty."[13] That is the basis upon which rests that freedom of the press which is essential

8. Ibid.

9. Charles Parker Co. v. Silver City Crystal Co., supra note 7, at 615, 116 A.2d at 445; Hassett v. Carroll, 85 Conn. 23, 36, 81 A. 1013, 1019 (1911); Atwater v. Morning News Co., 67 Conn. 504, 513, 34 A. 865, 866 (1896); Restatement, Torts § 619(1), at 310 (1938); Prosser, Torts § 95, at 629 (2d ed. 1955).

10. A newspaper's report of the activities of a public official within the scope of his employment [see Charles Parker Co. v. Silver City Crystal Co., supra note 7, at 616, 116 A.2d at 445] as a matter of law is an occasion of privilege. Corsello v. Emerson Bros., Inc., supra note 6, at 131, 137 A. at 392; Prosser,

Torts § 95, at 620 (2d ed. 1955); 1 Harper & James, Torts § 5.26, at 450 (1956).

11. Monczport v. Csongradi, 102 Conn. 448, 451, 129 A. 41, 42 (1925); Flanagan v. McLane, supra note 4, at 222, 87 A. at 728; Hassett v. Carroll, supra note 9, at 36, 81 A. at 1019; Restatement, Torts § 619(2) at 310 (1938).

12. See generally Coleman v. MacLennan, 78 Kan. 711, 98 P. 281, 20 L.R.A.,N.S., 361 (1908); Hallen, Character of Belief Necessary for the Conditional Privilege in Defamation, 25 Ill.L.Rev. 865, 872 (1931).

13. Conn.Const., Art. I, § 5.

to the life and strength of our institutions. Without a free press to report matters of interest and concern to the public, a democracy like ours could not long exist. While that freedom is to be in general accorded the press, you will no doubt have noted the limitation which the Constitution of this state places upon it in these words: " * * * being responsible for the abuse of that liberty."

The abuse occurs when a newspaper turns aside from the field of fair information and criticism and publishes an article as a result of malice, as I shall explain that word to you.

You see, you have two complementary rights, as I mentioned at the outset: that of the newspaper to publish accounts and comments about men and affairs, and that of the individual to be protected from the abuse of that right.

█ In determining whether or not the defendant went outside the field of fair comment and acted as a result of malice, you should consider the terms of the article and all circumstances connected with its preparation and publication; the efforts the defendant made before its publication to ascertain the truth; whether or not it gave the plaintiff an opportunity to comment upon it before publication—and I say, "plaintiff", throughout of course you understand I am referring to both plaintiffs—and if it did, the treatment it gave to any comments the plaintiff or plaintiffs made; whether the plaintiff, knowing of the charge, sought an opportunity to present to the defendant his side of the story. You should also consider the gravity of the charge; whether or not the article was a fair account or comment upon a matter of public interest; and whether the defendant felt that it was performing its duty in informing the public of the circumstances.[14]

I should like to mention at this time that when I refer to the defendant here, of course I'm referring to the only named party defendant to this action, the New York Times. The New York Times is a corporation, and of course can act only through its officers and employees. Mr. Parke, for example, is an employee of the New York Times, a staff reporter, the witness who testified, and also testified to certain conversations he had had with, I believe, his superiors, editors, city editor in New York. Also, I say again, while I may refer from time to time to the plaintiff, there are actually two separate cases here, the case of Lawrence Hogan against the New York Times and the case of Thomas Maloney against the New York Times. So, what I say as to one, unless otherwise stated, applies to both.

█ Under our law, the immunity of privilege is lost if the defendant can be shown to have made the claimed defamatory utterance for a purpose other than that for which the immunity was designed to afford protection.[15] Now, that is a rather compact statement. It has an awful lot in it. In a nutshell, it sums up the substance of the critical issue in this case. With your permission, I'll take the liberty of reading it again, trying as we go on to expand on the basis of this: namely, that an immunity of

14. Corsello v. Emerson Bros., Inc., supra note 6, at 133, 137 A. at 392:

"All the circumstances connected with the preparation and publication of the defamatory charge are to be considered and weighed in ascertaining whether the publication was made with malice in fact. Facts material to this inquiry are, the efforts made before publication to ascertain the truth of the charge and to give the plaintiff an opportunity to comment upon the publication, the gravity of the charge, whether the person accused requested an opportunity to see the article prior to its publication and warned the newspaper against its publication without giving him an opportunity to make comment upon it, whether it was fair comment of news of public interest and made in the performance of a duty owed to the public."

15. Charles Parker Co. v. Silver City Crystal Co., supra note 7, at 617, 116 A.2d at 446; Atwater v. Morning News Co., supra note 9, at 517, 34 A. at 868; Restatement, Torts § 603, at 268–269 (1938) ; 1 Harper & James, Torts § 5.27, at 452 (1956).

privilege, the privilege claimed by the defendant in this case, is lost if the defendant can be shown to have made the claimed defamatory utterance for a purpose other than that for which the immunity was designed to afford protection.

Or, to put it another way, the kind of malice which must be shown, in order to rebut the defense of privilege, is not ill will alone. Ill will, of course, would be highly significant if it were present. But ill will alone is not all that is required. It is better described as an improper purpose, that is, a purpose inconsistent with the social policy which is the purpose of the law to secure by the technical device of privilege.[16]

Now, obviously, if the defendant knew the story was false, no further evidence of malice would be necessary.[17] The privilege would instantly be abused, and therefore of no avail to the defendant.

If, however, you find that the alleged misstatements of fact in the publication, that is the New York Times, were made in the honest belief that they were true, then the question which you must resolve is a more difficult one. For, in such a situation, that is, where the defendant here, the New York Times, honestly believed in the truth of the defamatory matter published, you may nevertheless find that the privilege was abused only—and I underscore "only"— if you find that the evidence has established one or the other of the following sets of circumstances.

First let me go back just a minute— since this is, I might say, somewhat critical and I don't want to lose a single one of you—on this question of what you have to determine; whether the privilege, which the Court holds did exist and was the occasion of privilege in connection with this publication, was abused. Of course, if it was abused, it was defeated, and the defendant cannot rely on it.

In determining that, assuming you find—and I think there is not much dispute about it in the evidence, although it is a question that you have to determine—assuming that you find that the defendant honestly believed in the truth of the defamatory matter published, you may nevertheless find that the privilege was abused only if you find one of these two things to have existed:

(i) Number one, that the defendant's sole purpose and object in publishing the article was to expose the plaintiffs to ridicule and contempt.[18] That's one of the two things that would have to be shown.

Incidentally, on the establishing or the showing of an abuse of privilege, the burden is on the plaintiffs. The burden of establishing the defense of privilege is on the defendant;[19] but the Court has found there was an occasion of privilege. The plaintiffs claim that the privilege was abused; so the burden of proof is on the plaintiffs to show that.[20]

Now, in this connection of whether the defendant's sole purpose and object in publishing the article was to expose the plaintiff to ridicule and contempt, you should ask yourselves, perhaps among other things, but you should ask yourselves, and try to determine, whether the article was a sincere, even though humorous, description or criticism of

16. Restatement, Torts § 603, at 268–269 (1938); 1 Harper & James, Torts § 5.27, at 452 (1956).

17. Restatement, Torts § 600, at 264–265 (1938); 1 Harper & James, Torts § 5.27, at 452 (1956); Prosser, Torts § 95, at 628 (2d ed. 1955).

18. 1 Harper & James, Torts § 5.27, at 453 (1956).

19. Restatement, Torts § 613(2) (b) and (c), at 299 (1938); 1 Harper & James, Torts § 5.25, at 437–438 (1956).

20. Ely v. Mason, 97 Conn. 38, 44, 115 A. 479, 481 (1921); Moynahan v. Waterbury Republican Inc., 92 Conn. 331, 333, 102 A. 653, 654 (1918); Restatement, Torts § 613(1) (g), at 299 (1938); 1 Harper & James, Torts § 5.25, at 437–438 (1956).

police activities published for the purpose that the privilege was designed to protect. If so, you would be justified in finding the privilege was not abused under those circumstances. Or, on the other hand, you should ask yourselves the question, and determine, was the publication intended as a burlesque or a joke to amuse the newspaper readers at the expense of the plaintiffs. If you so find, you would be justified in finding that the privilege had been abused under those circumstances.

(ii) Now, the second situation, or set of facts, which, if you find exists, would justify you in finding that the privilege has been abused, even though the defendant honestly believed the story to be true when published, the second alternative set of facts would be these: that the defendant exhibited such a reckless disregard for the truth or falsity of the facts published as to be acting with wanton disregard for the effect of the publication on the plaintiffs.[21] In short, to constitute an abuse of the privilege in this way, you must find that the defendant acted with such reckless disregard for the facts as to constitute bad faith.

■■■ Among the factors to be considered in connection with this second set of facts or circumstances, which, if you were to find that they existed, would justify your finding an abuse of privilege, among the factors to be considered by you in determining whether the defendant did act in good faith, are these— these aren't all, but these are some that you might consider:[22] First, was there an honest, good faith belief by the defendant in the facts as published?[23] Secondly, were there grounds for such good faith belief, and correlatively, were there no grounds for disbelief in the facts as published?[24] Thirdly, was

21. E. g., "A reckless disregard of the truth or falsity of facts stated in a political address and broadcast would amount to bad faith." Charles Parker Co. v. Silver City Crystal Co., supra note 7, at 618, 116 A.2d at 446. See note 23, infra.

22. "If he honestly and in good faith *believed* what he said, if there were *grounds* for such belief, and if his *purpose in saying what he did was an honest desire to discharge his duty* as a candidate by informing the electorate of facts which he believed to be true and expressing his views thereon, that is all that is required." Charles Parker Co. v. Silver City Crystal Co., supra note 7, at 618, 116 A.2d at 446. (Emphasis added.)

23. Ely v. Mason, supra note 20, at 44, 115 A. at 481; Barry v. McCollom, 81 Conn. 293, 297, 70 A. 1035, 1036 (1908); Haight v. Cornell, 15 Conn. 74, 82 (1842).

24. Much has been written on the state of a defendant's mind required to be proven by a plaintiff to defeat the conditional privilege which otherwise shields from liability the publisher of defamatory remarks even though false. See generally 1 Harper & James, Torts § 5.27, at 450–456 (1956); Prosser, Torts § 95, at 627–629 (2d ed. 1955); Noel, Defamation of 'Public Officers and Candidates, 49 Colum.L.Rev. 875, 888–900 (1949);

Evans, Legal Immunity for Defamation, 24 Minn.L.Rev. 607 (1940); Hallen, op. cit. supra note 12; Purrington, An Examination of the Doctrine of Malice as an Essential Element of Responsibility for Defamation Uttered on a Privileged Occasion (pts. 1–2), 57 Albany L.J. 134, 149 (1898).

In Charles Parker Co. v. Silver City Crystal Co., supra note 7, at 616, 116 A. 2d at 445, Connecticut has adopted the "liberal" rule of Coleman v. MacLennan, supra note 12. See 62 Harv.L.Rev. 1207, 1211 (1949); 36 B.U.L.Rev. 137 (1956). This rule may be stated thus: where an article is published and circulated for the purpose of giving what the defendant believes to be truthful information concerning a public officer to enable the public better to evaluate the public officer as a public officer, the article is privileged if written in good faith and without malice, although the written matter be false and defamatory.

In accepting "as the correct viewpoint" the rule of Coleman v. MacLennan, supra note 12, the Supreme Court of Errors expressly rejected the contention that the immunity of privilege dealt with in the Parker case was limited to cases involving candidates for office; the court said in the Parker case, supra note 7, at 617, 116 A.2d at 446:

"In Coleman v. MacLennan, supra, the court states, 78 Kan. at page 734, 98 P.

there an honest desire and effort on the part of the defendant to discharge the duty protected by the privilege?[25]

In this connection, you should ask yourselves whether the reprinting and so-called "dressing up" of the Stam-

at page 289: '[I]t must be borne in mind that the correct rule, whatever it is, must govern in cases other than those involving candidates for office. It must apply to all officers and agents of government-municipal, state and national; to the management of all public institutions-educational, charitable and penal; to the conduct of all corporate enterprises affected with a public interest-transportation, banking, insurance; and to innumerable other subjects involving the public welfare.' We accept this as the correct viewpoint."

Connecticut has rejected the "narrow" rule of Post Publishing Co. v. Hallam, 59 F. 530, 539–542 (6 Cir. 1893) (Taft, J.) and Burt v. Advertiser Newspaper Co., 154 Mass. 238, 242–245, 28 N.E. 1, 4–5, 13 L.R.A. 97 (1891) (Holmes, J.). Judge Taft's opinion in the Hallam case approved the trial judge's charge to the jury to the effect " * * * that while criticism and comment, however severe, if in good faith, were privileged, false allegations of fact, as, for instance, that the candidate had committed disgraceful acts, were not privileged, and that, if the charges were false, good faith and probable cause were no defense, though they might mitigate damages." 59 F. 530, 539. See Hallen, op. cit. supra note 12, at 872. Proof that the defendant did not "act as a reasonable man under the circumstances", or that the defendant was negligent in gathering his facts, will not therefore constitute the "malice in fact or a lack of good faith" required to defeat the conditional privilege in Connecticut. Id. at 871. "[W]ant of care or * * * thoughtlessness" do not constitute bad faith. Charles Parker Co. v. Silver City Crystal Co., supra note 7, at 618, 116 A. 2d at 446. Contra, Restatement, Torts § 601, at 265 (1938).

In the Parker case, the Supreme Court of Errors, in defining the "malice in fact or a lack of good faith" required to defeat a conditional privilege, enunciated a standard of conduct which for years had been shrouded in confusion. In Moynahan v. Waterbury Republican Inc., supra note 20, at 335, 102 A. at 654, the court found that a caricature "designed to expose the plaintiff to scorn and ridicule" and statements "made recklessly and without sufficient excuse" were evidence of malice. In Barry v. McCollom, supra note 23, at 297, 70 A. at

1036, the court required as a subjective standard nothing more than "grounds for such a belief which then seemed to him reasonable and sufficient, and that his motive in making the publication was an honest desire to discharge the duties of his office with fidelity." This standard was adhered to in Ely v. Mason, supra note 20, at 44, 115 A. at 481. See also the standards approved in Anderson v. Cowles, 72 Conn. 335, 339, 44 A. 477, 478 (1899) ("reason to believe"); Gray v. Mossman, 88 Conn. 247, 251, 90 A. 938 (1914) ("unjustifiable motive"); Gray v. Mossman, 91 Conn. 430, 434, 99 A. 1062 (1917) ("reasonable grounds").

Parker requires more than a showing of false statements or ordinary carelessness to establish the lack of good faith sufficient to destroy the privilege: there must be a "reckless disregard of the truth or falsity of facts" or the absence of "an honest desire to discharge [the] * * * duty" for which the immunity was designed to afford protection. Charles Parker Co. v. Silver City Crystal Co., supra note 7, at 617–618, 116 A.2d at 446.

"Good faith" requires honest belief, grounds for the belief, and an honest desire to discharge the duty protected. See note 22, supra. *The required grounds for belief depend on the nature of the duty performed by the communication.* An employee may have a duty to communicate a mere suspicion to his employer—"it may be proper for him to communicate reports or suspicions which he himself does not believe." Pollock, Torts 284 (13th ed. 1929); Restatement, Torts § 602, at 266–268 (1938); 1 Harper & James, Torts § 5.27 nn. 19–21 (1956) and accompanying text.

The duty of a newspaper to the public is somewhat more circumscribed. Compare Ely v. Mason, supra note 20, at 44, 115 A. at 481, and Moynahan v. Waterbury Republican, Inc., supra note 20, at 335, 102 A. at 654. Unless the newspaper has had no opportunity to make a proper investigation, and great danger might attend the withholding of unfounded rumor, and the rumor is reported as rumor [Restatement, Torts § 602, at 266–268 (1938)], there must be grounds for the belief in the statements published sufficiently reliable to avoid the conclusion by the jury that the publishing of these facts was a reckless, wanton disregard

25. See Note 25 on Page 112.

ford Advocate story constituted a reckless disregard for the truth or falsity of the facts to such an extent as to constitute a wanton disregard of the effects of the publication on the plaintiffs.[26]

In other words, were the facts of the story, as published in the Stamford Advocate, impossible or extremely difficult to check because of the distance or inaccessibility of the source of that publication?[27] Or, was there a critical need for immediate dissemination of the news?[28] Those are questions that you might appropriately ask in connection with that part of your determination.

 I charge you as a matter of law that one who disseminates defamatory information about another which was originally published by a third person—here the Stamford Advocate—is liable as though the dissemination were an original publication by him, unless he has no reason to know of its defamatory character.[29]

for truth and the interests of the defamed.

25. Moynahan v. Waterbury Republican Inc., supra note 20, at 335, 102 A. at 654; Atwater v. Morning News Co., supra note 9, at 513, 516-517, 34 A. at 866, 868. The purpose of the conditional privilege is to protect the newspaper acting in the performance of a duty which the law encourages, to protect the dissemination of publicly significant information about public officers, and ultimately to protect the public interest in this information.

If the defamatory matter is published not with this duty and purpose in view, the occasion of privilege is abused. Restatement, Torts § 603, comment *a*, at 268-269 (1938); 1 Harper & James, Torts § 5.27, at 452 (1956).

For example, "Generally the publication must be no wider than will meet the requirements of the moral or social duty to publish. If it be designedly or unnecessarily or negligently excessive, privilege is lost. But, if a state newspaper published primarily for a state constituency has a small circulation elsewhere, it is not deprived of its privilege in the discussion of matters of state-wide concern because of that fact." Coleman v. MacLennan, supra note 12, at 743, 98 P. at 292.

26. See notes 21 and 22, supra.

27. 1 Harper & James, Torts § 5.18, at 404 (1956).

28. Ibid.

29. The Court of Appeals for the Second Circuit in Morning Union Co. v. Butler, 151 F. 188 (2 Cir. 1907), in affirming a judgment entered on a plaintiff's verdict in a libel action in the District of Connecticut, held that the defendant newspaper's publication, which paraphrased an article about plaintiff in another newspaper without inquiring as to its truthfulness, warranted a finding of "malice in fact"

since "it was recklessly published, in disregard of the plaintiff's rights and of the consequences that might result * * *" Id. at 190.

Likewise, the Court of Appeals for the Second Circuit in Bennett v. Salisbury, 78 F. 769, 772 (2 Cir. 1897), in an opinion by Judge Shipman, stated:

"The subject of the care that shall be demanded from the large daily newspapers of the country in the investigation of the charges of misconduct or of crime which they publish in regard to persons who are comparatively unknown beyond the communities in which they live, has been, of late, frequently before judges and juries. It has become the course of business of newspapers of this class to receive announcements of this character from news bureaus and from numerous special correspondents who are scattered over the country, and it has been the custom of some daily journals to rely upon the good faith and accuracy of these correspondents, and to publish, in substance, whatever they sent over their own signatures, without further investigation into its truthfulness, and, in an action for libel, when the falsehood of the publication was manifest, to attempt to ward off the charge of recklessness by saying that the information was received and was published in the usual course of business. Neither judges nor juries have been satisfied with the sufficiency of this kind of care. It is so insufficient as to be justly regarded as an absence of care, and as recklessness with respect to the rights and reputations of strangers to the publisher. The excuse was itself regarded as indicative of a careless indifference to and ignorance of the obligations of an owner to use his property so as not to injure others."

Restatement, Torts § 581, at 208 (1938). Comment "*b*" states in relevant part, "Under the rule stated in this Section, one who only disseminates mat-

That is all I have to say on the third question that has to be determined, the third question that I have enumerated—actually, the first question for your determination. In short, was the privilege—which I hold as a matter of law was available to the defendant since it was a privileged occasion—[30] in short, did the defendant abuse that privilege?

## (4) Were Plaintiffs Damaged By The Publication And, If So, In What Amounts?

The fourth question is—and you don't get to the fourth question unless you find that there was an abuse of that privilege; in other words, unless you resolve that question favorably toward the plaintiffs, or either of them, you do not reach the fourth question—which is the question of damages. If, however, you do determine that there was an abuse of the privilege as to either or both plaintiffs, then the final question is: Were the plaintiffs damaged and, if so, in what amounts?

This is not as easy as the statement of the question, and not as easy comparatively as in other types of litigation, to determine the amount of damages, if any, that an injured person, after establishing his injury, is entitled to.

### (a) Retraction Statute; Malice in Fact; Special Damages

We have a statute in Connecticut which fixes a limitation upon the damages which may be recovered in the case of a libel per se, which is this case, as I have ruled, and so charge you; that is one where the law ordinarily would permit a recovery of general damages without special allegation or proof. Now, this statute which has been referred to, I think by both counsel in the case—counsel on both sides, I should say—reads as follows:

"Damages in actions for libel. In any action for a libel the defendant may give proof of intention; and unless the plaintiff proves either malice in fact or that the defendant, after having been requested by him in writing to retract the libelous charge, in as public a manner as that in which it was made, failed to do so within a reasonable time, he shall recover nothing but such actual damage as he may have specially alleged and proved." [31]

What does that mean in a nutshell? First, it says that in a libel action, the defendant, here the New York Times,

ter first made public by a third person does not do so at the peril of liability for defamatory imputations unknown to the disseminator and incapable of ascertainment by the exercise of reasonable care. The burden of proof, however, is upon the defendant to prove that he had no reason to know of the defamatory character of the matter thus republished."

According to 1 Harper & James, Torts § 5.18, at 404 (1956), "The cases are divided as to what rule should be applied to a newspaper publishing a defamatory news item received from a responsible news gathering agency such as the Associated Press, the United Press or the International News Service * * *. What appears to be the prevailing view, however, holds the newspaper to a strict liability, regardless of its lack of knowledge or means of ascertaining the truth of the defamatory publication", citing Wood v. Constitution Publ. Co., 57 Ga.App. 123, 194 S.E. 760 (1937), noted in 15 N.Y.U.L.Q.Rev. 589

(1938), 37 Mich.L.Rev. 566 (1939); Louisville Times Co. v. Lyttle, 257 Ky. 132, 77 S.W.2d 432 (1935); Belo & Co. v. Smith, 91 Tex. 221, 40 S.W. 856 (1897). See Siebert, Rights and Privileges of the Press 148 (1934). Moreover, as further pointed out in 1 Harper & James, Torts § 5.18, at 404 (1936), "The news agency which originated the report is, of course, liable as a publisher to its subscribers and as a cause of their republication of it", citing KVOS v. Associated Press, 13 F.Supp. 910 (W.D.Wash. 1936); and see Wahlheimer v. Hardenbergh, 217 N.Y. 264, 266, 111 N.E. 826, 827 (1916), and 15 N.Y.U.L.Q.Rev. 589, 590 (1938).

30. See note 9, supra.

31. Conn.Gen.Stat. § 52–237 (1958). Hotchkiss v. Porter, 30 Conn. 414, 419–424 (1862); Moore v. Stevenson, 27 Conn. 14, 25–29 (1858). Cf. 1 Harper & James, Torts § 5.19, at 408–410 (1956).

may give proof of its intention.[32] Well, just in plain, every-day language, I assume that to mean that the defendant may do just what it did in this case: come in with its appropriate representatives and testify, as Mr. Parke did, to the circumstances under which this publication was prepared and published, showing the intention of the defendant in publishing the alleged libelous material.

But, it goes on to say that in a libel action, the plaintiff, here the plaintiffs, would be limited to special damages. Those are damages specially pleaded and proven, such as, for example, the doctor's bill that Officer Hogan introduced, treatments by a doctor; and there was testimony, I believe, by the plaintiff Maloney that he had lost in the neighborhood of $100 or $125 in the way of extra compensation because he didn't feel up to handling this part-time job in Miller's Exchange or Miller's Distributors, as a result of this libel. Those are the only two elements of special damages in this case that I recall there to be any proof of; special damages as distinguished from general damages or compensatory damages, the nature of which I shall explain to you in a minute.

Going back to this statute, it says that unless one of two things is established, the plaintiff in the situation of these plaintiffs would be limited to such special damages as have been claimed and proven. The two events that they must establish, one or the other, are: number one, that the defendant refused to retract the story once a request was made; and secondly, if they can't show a refusal to retract when the request was made, if they can show that there was malice in fact on the part of the defendant in publishing the story, then they recover general damages as distinguished from special damages.

As for this retraction, or request to retract, I think it is not disputed that a request by or on behalf of the plaintiffs was made at a time toward the end of December, 1958, to the New York Times, to publish a retraction within the terms of this statute. It is further not disputed that that requested retraction was declined, denied, refused by the New York Times early in January of the following year, 1959. However, I construe that statute, and I am going to charge you ladies and gentlemen as a matter of law, that that statute contemplated a reasonably prompt request for a retraction,[33] even though I state categorically and without any fuzzing of the issue that the requirement of a prompt request for retraction is not in the statute. In other words, I think it is a matter of reasonable, common-sense interpretation of the statute that, if a newspaper such as the New York Times is going to be asked to publish a retraction with the same type of prominence as the alleged libelous article, the request for the retraction ought to be made promptly.

And, I am going to hold, as a matter of law, that that request by or on behalf of the plaintiffs two and one-half months after the publication of the alleged libelous article, that that was not sufficient compliance with this statute to enable them to invoke it.

I, therefore, rule and charge you as a matter of law that you should disregard the fact of the requested retraction insofar as the application of this statute is concerned.

We come down, therefore, to whether or not there has been established malice in fact, within the meaning of the statute. Because, if the plaintiffs, or either of them, have established to your satisfaction malice in fact on the

---

32. Arnott v. Standard Ass'n, 57 Conn. 86, 92–94, 17 A. 361, 361–362, 3 L.R.A. 69 (1888); Moore v. Stevenson, supra note 31, at 25–29.

33. "At common law a retraction does not exonerate the defamer, unless it is made immediately after the defamation, and is so clearly connected with it that in effect it negatives the utterance itself." Prosser, Torts § 96, at 632 (2d ed. 1955).

part of the defendant, in the publication of this article, then they are entitled to recover general damages. The short of it is, ladies and gentlemen, for the purposes of this case, you may disregard the request by the plaintiffs to the defendant to retract that article. I have tried to explain why I have ruled the way I have, which to me is simply a matter of ordinary common sense, regardless of the language of the statute.

Under those circumstances, I charge you as follows: That this statute provides that in such an action as this, the defendant may offer proof as to his intention in making the statement, as the defendant here has done, and unless the plaintiff proves that the statement was made with malice in fact, the plaintiff can recover only such actual damage as he has suffered which he has specially alleged in his complaint and has proven, which I referred to, as the doctor's bill for Mr. Hogan and the loss of part-time wages for Mr. Maloney.

You will recall that the defendant offered evidence of the circumstances surrounding the making of the statement, and the purpose of that is to show that the defendant did so in an honest effort to serve a purpose which it deemed to be proper. In effect, this evidence was intended to rebut any claim that the de-

fendant acted maliciously. The plaintiffs can recover nothing more than the special damages they have alleged and proven, unless they also have proven to your satisfaction that the statement, the publication in the New York Times, was made with malice.

Malice has in the law a broader meaning than we ordinarily give to it.[34] We usually think of malice as meaning hatred or ill will felt for the other person concerned, or a desire to do him injury. If the statement was inspired by such feelings, it would be malice, of course. But, in the law that we are talking about here, malice includes also the fact that the statement was actuated—if in fact it was—by some improper or unjustifiable motive, not by an honest intention to serve some proper purpose.[35]

In determining whether there was such malice on the part of the defendant, you must consider among other things the time of the publication, the place and manner of the making of the publication, its language, and all the circumstances surrounding the making of the publication, as you find them to have existed,[36] including the intention the defendant had in any attempt he made to ascertain whether or not the statement was true.[37]

34. "The phrase 'malice in fact' is a technical one, and, as the common law stood before the passage of the act of 1885, did not mean malignity, spite or hatred, but improper and unjustifiable motive; and such the court [referring to the holding in Moore v. Stevenson, supra note 31, at 25–29] held was its meaning in the law in question." Hotchkiss v. Porter, supra note 31, at 421.

35. Proto v. Bridgeport Herald Corp., supra note 6, at 564, 72 A.2d at 825; Sandora v. Times Co., 113 Conn. 574, 579–580, 155 A. 819, 821 (1931) [see approved charge on "malice in fact" in Sandora, id. at 582, 155 A. at 822]; Corsello v. Emerson Bros., Inc., supra note 6, at 132, 137 A. at 392.

36. Hassett v. Carroll, supra note 9, at 37, 81 A. at 1019; Osborne v. Troup, 60 Conn. 485, 492–493, 23 A. 157, 159

(1891); Wynne v. Parsons, 57 Conn. 73, 78–79, 17 A. 362, 364 (1889); Hotchkiss v. Porter, supra note 31, at 421–422; Moore v. Stevenson, supra note 31, at 28.

37. E. g., findings of malice in fact have been held justified when the publication was "* * * made without authority, or such authority as would be regarded as entitled to credence among upright and careful men, or manifesting an entire indifference whether the charge is true or false and whether the plaintiff is injured or not. * * *" (Moore v. Stevenson, supra note 31, at 28) or when there was "* * * no careful or reasonable investigation of the facts * *." (Osborne v. Troup, supra note 36, at 493, 23 A. at 158). Belief in the truth of the libelous statements is not sufficient to negative "malice in fact". Morning Union Co. v. Butler, supra note 29, at 189; Moore v. Stevenson, supra note 31, at 27.

Unless the plaintiffs, and each of them, have proven to you by a fair preponderance of the evidence that the statement was made with malice, as I have explained that to you, then the plaintiffs can recover only such special damages as they have alleged and proven.

So, in a nutshell, if you do find that the plaintiffs have not established malice in fact, as I have described it, or that either of them has not established it, your verdict would be limited to the special damages claimed by each. I believe I am correct in my recollection that the only special damage proven by the plaintiff Hogan was a $20 doctor's bill, which is in evidence, and as to the plaintiff Maloney, approximately $100 or $125 representing four or five days of lost time by reason of his part-time job. If, on the other hand, the plaintiff has proven, the plaintiffs have proven, to your satisfaction the statement was made with malice, then you will arrive at the amount of damages that the plaintiff or plaintiffs, as the case may be, are entitled to recover in the following manner.

### (b) General Damages

We come now—we are now leaving the subject of special damages—and we are now on the basis for recovery of general damages, or so-called compensatory damages, assuming that you find the publication was made with malice. If you do not so find, of course you do not reach this element of damages.

 If you find the plaintiffs have established the defendant's libelous publication was the result of actual malice, as I have attempted to explain it to you, then the plaintiffs are entitled to recover what we call "general damages." Such damages are a sum which, as far as money can do it, will compensate the plaintiffs for the injuries which have resulted directly and as a natural consequence of the statements referred to in the New York Times article.[38] I say here, parenthetically also, that the only alleged damage for which the plaintiffs can recover, if you reach this point in the case, is the damage, if any, which flowed from the publication of the New York Times article, and that article alone. They are not entitled to recover, and they do not claim in this case any recovery, for damages from the publication by any third person, such as the Stamford Advocate, or some other paper that I think was mentioned which carried this article in substance.

 In determining the amount of such damages,[39] that is the general damages properly due to the plaintiffs, you should consider the extent to which their reputation has been affected for the worse,[40] and as incidental to that, their injured feelings, any ridicule or shame which has come to them because of these statements, any insult, humiliation, or disgrace which they have been caused.[41] The plaintiffs are entitled to recover not only for such damages that they have suffered up to this day, but also such damages or loss as you may find reasonably certain to be sustained by them in the future.[42] And, if you find that their damages and losses have been enhanced by the bringing of this action and the trial of this case, with the consequent publicity, you should consider that factor as part of your measure of damages.[43]

**38.** Sandora v. Times Co., supra note 35, at 581–582, 155 A. at 822; Hassett v. Carroll, supra note 9, at 37, 81 A. at 1019–1020.

**39.** See generally 1 Harper & James, Torts § 5.30, at 468–473 (1956).

**40.** Proto v. Bridgeport Herald Corp., supra note 6, at 571, 72 A.2d at 828; Sandora v. Times Co., supra note 35, at 581–582, 155 A. at 822; Hassett v. Carroll, supra note 9, at 38, 81 A. at 1020.

**41.** Ibid.

**42.** Craney v. Donovan, 92 Conn. 236, 245, 102 A. 640, 643–644, L.R.A.1918C, 96 (1917); Restatement, Torts § 621, comment d (1938).

**43.** Cf. Davidian v. Paparian, 115 Conn. 718, 719, 161 A. 796, 797 (1932).

Among the essential facts of such an action as this, the injury to the plaintiffs' reputation, you must in determining what compensation, if any, you are going to award them, consider what their reputation was in the community when the defendant's statements were made;[44] for it is their damage by reason of those statements that measures their right to recover.

I might say—and again I think there is no dispute and there was no evidence to the contrary and I do not understand that the defendant in any way challenges or disputes the fact—that these two plaintiffs, Mr. Hogan and Mr. Maloney, enjoyed excellent reputations in their community. I do not think that is an issue which was disputed. Of course the defendant denies that there was any damage or injury to that reputation, and certainly not as a result of the article published under the circumstances that the defendant claims, being one of privilege. But, just as we have on the one hand here a newspaper of undoubted integrity, excellence of reputation—indeed, one of the great newspapers of this Country and the world, and there is no challenge or dispute of the excellence of reputation enjoyed by the New York Times—by the same token, I think the same thing applies to these plaintiffs in their community, and more specifically, in their vocation as police officers.

I do not propose here to summarize that testimony, or in any way refer to it other than this: I think I am fairly stating the claims of both sides that there is no dispute as to the outstanding reputation of these men, and it has this bearing, as you can appreciate, that if you do find—and this is exclusively your function to determine whether they are entitled to recover—if they are, their standing in their community, particularly in the vocation which is theirs as police officers, is directly relevant to the amount of damages, if any, that you choose to award.

So, in short, the essential basis of such an action is this: the injury to the plaintiffs' reputations. I believe I mentioned that you must, in determining the compensation, consider what the reputations in the community were when the defendant's statements were made where such damages by reason of those statements would measure their rights to recover.

So, you must consider the time, the place, the manner of making the statements, how much publicity resulted, and all the circumstances surrounding it.

I can give you no definite rule for measuring the damages that you should award the plaintiff or plaintiffs if you reach that point in the case. I must leave it to your own sound judgment as a matter of your exclusive province in this case. You must remember, however, that your duty is to award the plaintiffs, if you find that they are entitled to recover, fair compensation, and only fair compensation. Favor, bias, or prejudice must have no place in your deliberations—which I am sure I need hardly say to you ladies and gentlemen.

With respect to this second category of damages—I mentioned the first category, so-called "special" damages—the only other thing to be said with respect to this element of general, compensatory damages is that, as I think the lawyers have mentioned to you, and you will see by the complaint, each plaintiff claims $75,000 in damages. In no event can your verdict exceed that amount for each plaintiff. That sets the top limit, and I so charge you.

**(c) Exemplary Damages**

There is one other element of damages, one other category of damages which has been referred to here; that is so-called "exemplary" damages. You would reach that, the awarding of exemplary damages as distinguished from special and general damages, only in the event that you find, in the manner in which I have described to you, that there

44. Bennett v. Hyde, 6 Conn. 24, 26 (1825); 1 Harper & James, Torts § 5.30, at 469 (1956).

was actual malice in the publication of this article. If you find there was actual malice, you may in your discretion— you are not required to, but you may if you choose—award separately in addition to what other damages you may award, you may award exemplary damages, provided they do not exceed the expenses to the plaintiffs of this litigation, less taxable costs.[45] The only evidence that I recall that has been introduced here on that subject is as a result of a stipulation between counsel that $200 per day was the minimum fee sanctioned by the Stamford Bar Association for one day's appearance in the Superior Court. That is the only evidence I know of in this case on that issue.

## VI

### WHAT CONSTITUTES EVIDENCE

Briefly I'll just mention a few other matters for your consideration, particularly with respect to, first, what constitutes evidence in this case. I think you know now, and I should not belabor it, that the evidence here consists of, first, the testimony of the witnesses under oath. Secondly, the exhibits which have been actually received and marked in evidence; those exhibits will be with you in the jury room. Thirdly, any admissions made; for example, the admission by the defendant that the article was published and circulated, as appears in the defendant's answer to the appropriate paragraphs in the complaint. Fourthly, any stipulations between counsel also constitute evidence.

Any evidence as to which an objection was sustained by the Court and any evidence ordered stricken by the Court must be entirely disregarded by you ladies and gentlemen. Likewise, statements and arguments of counsel are not evidence in the case, unless made as an admission or stipulation of facts.

45. Proto v. Bridgeport Herald Corp., supra note 6, at 571, 72 A.2d at 828;

## VII

### BURDEN OF PROOF

On the subject of burden of proof, much could be said, and I should try to be very brief about it. I think most of you ladies and gentlemen are familiar with the burden of proof rules in a civil case. The burden of proof is on the plaintiff from the beginning throughout the case. It never shifts. They are required, the plaintiffs are required, in order to prevail, to establish by a preponderance of the credible evidence each issue as to which they have the burden of proof.

By a preponderance, as many of you have heard described, is best illustrated by considering an apothecary scale with the two sides in equal balance. Put the plaintiff's evidence on one side and the defendant's evidence on the other. If the scales tip ever so slightly in favor of the plaintiff, the plaintiff's evidence outweighs the defendant's, and then the plaintiff has sustained his burden of proof. On the other hand, if the scales tip the other way, in favor of the defendant, then of course the plaintiff has not sustained his burden of proof. If the scales are in equipoise, in other words, evenly balanced, the plaintiff has not sustained his burden of proof.

The burden is on the plaintiffs with respect to all issues in this case, with respect to each of the questions I put to you, except as to the defense of privilege, as well as the defenses of truth and fair comment referred to by Mr. Callahan; as to those the defendant has the burden of proof. But on the defense of privilege, the one which I referred to first which gives rise to the first question for you ladies and gentlemen to determine, whether that privilege has been abused, there the burden is on the plaintiffs to establish to your satisfaction by a fair preponderance of the credible evidence that there has been an abuse of that privilege. In all other respects, I believe I am correct in stating, the bur-

Wynne v. Parsons, supra note 36, at 73, 84, 17 A. at 366.

den is on the plaintiffs with respect to all issues in the case, including the issues with respect to damages that I have mentioned to you.

## VIII
## CREDIBILITY OF WITNESSES

On the subject of credibility of witnesses, there has been a good deal of discussion here, and I would like to just say this: the question of whether a witness is telling the truth, the question of what weight you are to accord to his or her testimony, is solely your function. It is no one else's. There is no better way to judge the credibility of a witness than to just use your ordinary, down-to-earth, common horse-sense. You deal with people every day in the week in your business affairs and household affairs. You see a witness on the witness stand, and you watch him or her testify. You will, just by instinct, observe twitches or nervousness or indications of whether or not he is telling the truth. I could charge you all night as to things you might look for, but it is really like carrying coals to Newcastle to suggest to you ladies and gentlemen the rules by which you judge the credibility of a witness, or the weight to be given to a witness' testimony.

Let me just say very simply this: that everything that a witness does counts in your determining where the truth lies. His demeanor on the stand very often is just as important as what he says. So-called "demeanor testimony" often is much more important than the substance of his testimony. Little checks such as this: if a witness is caught in a mistake on cross examination, contradictions in testimony, or errors as to dates, and so forth, sometimes the surest test as to whether you have a truthful witness on the stand is his or her reaction to that mistake once it is called to his attention. Does he try to cover it up, hedge on it, or does he come right out frankly and say, "I was in error with respect to the prior testimony"? Those are the sort of tests which you can apply.

If you find that any witness has testified falsely with respect to a material fact in the case, you may, but you are not required to, disregard his entire testimony. Or, in your discretion, you may choose to follow that which you believe is true, and reject the balance. It is entirely within your discretion to weigh it, to determine the weight to be given to the testimony and to judge the credibility of the witnesses.

## IX
## FAILURE TO CALL WITNESSES

There has been some talk, some claims made, with respect not only to witnesses who appeared, but as to those who did not appear. I will charge you very simply as to that. If you find that any party, whether it be plaintiffs or either of them, or the defendant, had within their control a witness whose testimony you believe would have been material, germane to the issues in the case, and if that witness you find was in the control of one of the parties and not called, you may, but you are not required to, infer that his or her testimony, if produced on the witness stand, would have been unfavorable to the party who failed to call him or her.

The key to that statement I emphasize is whether the witness was under the control of the party against whom you seek to draw that inference. And by being under control of the party, I do not refer to the subpoena control exercised through the Court. Of course, any person who resides or is found within this district, or within one hundred miles of the courthouse, is subject to subpoena. That is not the sort of control referred to.

## CONCLUSION

In conclusion, I am sure I need hardly say to you ladies and gentlemen that this case is of importance to both of the plaintiffs and to the defendant. For the reasons I have previously indicated, and which I am sure each of you fully appreciates, it deserves your careful, patient, continued consideration.

I will ask you not to try to rush this matter; to give it the care and deliberation that both parties, both the defend-

ant and the plaintiffs, would want you to give it.

You must, in order to return a verdict, be unanimous. In other words, all twelve jurors, with the exception of the two alternates, must agree. The two alternates will be excused as soon as the charge is completed.

It is important to the parties as well as to the public and the Court that you reach a verdict by unanimous vote. In doing so, however, I do not mean to suggest for one moment that any one of you should yield any deep-seated convictions or beliefs in order to achieve unanimity. You should listen to each other; exchange views as a result of your deliberations. Your original views or views that you form as you go along, if they prove to be wrong, don't hesitate to yield if you are persuaded that you are wrong. But, on the other hand, the thing to bear in mind, I think, is that in the last analysis it is your own judgment, your own conscience, which controls and should control your vote. While it is in the public interest to obtain a verdict, which means a unanimous jury, there is perhaps an even higher interest, a more substantial interest: that each of you should feel answerable only to your own conscience for your verdict.

The clerk has prepared a form of verdict in each case: in the case of Lawrence Hogan against the Times and in the case of Thomas Maloney against the Times. In each case, there is a form of verdict. One is a defendant's verdict, which, if you resolve the issues in favor of the defendant, simply would be signed by the foreman. The form of plaintiff's verdict in each case provides for your setting forth the amount of damages—special, general, exemplary—if you agree upon a plaintiff's verdict, and if you decide that such damages, or any of them, have been proven, and that the plaintiffs are entitled to them.

You may now retire to your jury room, elect one of your number as foreman or forelady, and proceed to your deliberations. When you have agreed upon a verdict, let the bailiff or the marshal know, who will be outside your door or nearby, and through him the clerk and the Court will be notified. I will be here as long as you are.

You are also entitled to be the guests of the United States for dinner tonight, if your deliberations go beyond the normal dinner hour. I will leave it to your discretion as to how you want to proceed about that—if you want to retire and start deliberating now, or whether you'd rather go out to dinner and come back.

There are a few legal matters that I have to take up with counsel. Under the rules counsel on each side are entitled to make certain comments with respect to the Court's charge to the jury and to request additional charges or to object to anything that I have said. That opportunity, under the rules, must be accorded to counsel before the jury actually begins to deliberate. So, you may take that into account in deciding when you want to go to dinner.

I'd like at this time to excuse the two alternates, with the thanks of the Court. I am deeply appreciative of your patient, intelligent attention to this case which has been on trial about a week now. I will excuse both of you until further call of the Court. In other words, there will be no fixed date for your return. The jury that is to be impanelled the first thing in the morning, Friday morning— we will not bother any of you ladies and gentlemen to be on that jury. We will try to get that jury without having to burden you people. I will tell the jurors at the end of the session when next to report. I think for the time being I will simply leave it that you are excused until further call of the Court, with the thanks of the Court.

With that, ladies and gentlemen, you may retire to the jury room. I will ask you not to proceed with the actual deliberations until I send the exhibits in to you; that will be the signal that the lawyers have had an opportunity to take up with me the legal matters that I referred to.

For now, we will stand in recess and relax. If you want to decide whether you want to go to dinner now or later, just let Mr. Brewster or Mr. McKee, who is the deputy marshal who will be in charge, know. I believe he's already made arrangements, as a matter of fact, either to get dinner in to you or to get you out. Thanks very much for your patience.

[The jury retired and subsequently, with the permission of the Court, elected to go out to dinner before commencing their deliberations. The jury returned at 9:27 p. m. and delivered the following verdict, which was accepted and ordered recorded by the Court:

"Lawrence Hogan versus New York Times Company, plaintiff's verdict. The plaintiff to recover of the defendant the sum of $5,000 for general damages, $20 for special damages, and $1,000 for exemplary damages; a total of $6,020.

"In the case of Thomas Maloney against the New York Times Company, plaintiff's verdict. The plaintiff to recover of the defendant the sum of $5,000 for general damages, $125 for special damages, and $1,000 for exemplary damages; a total of $6,125.

"THE COURT: The Court will order the verdicts as reported by Admiral Fife, Foreman, recorded, and the Court accepts the verdicts in both cases.

"The remaining thing is to thank you ladies and gentlemen for your patient, intelligent, loyal service as jurors in this case, and for whatever aid and comfort it may be to you, in consideration of your service, and particularly until this hour of 9:30 p. m., you will be excused from appearing on Friday when the next case will be impanelled.

"I might say this, with respect to any one of you, if your situation is such that service at this time will be an imposition on you, just let Mr. Grimes or anyone in the clerk's office know, and I think we can make arrangements to accommodate you. I would say, on the other hand, that those of you who would like to continue to serve on this panel, we have some interesting cases coming up, and at least speaking for myself, I would be delighted to have any of you continue to serve who would like to. It has been a real pleasure to have you with us on this case, and I want to thank each of you, and I will take the liberty on behalf of counsel, so as not to embarrass them —I would think they would join me in expressing to you in behalf of counsel and their respective clients, regardless of the outcome, the sincere thanks of all of us for the services that were yours in this case.

"Thank you very much.

"THE FOREMAN: Judge, if I may say, sir, I don't know whether it is appropriate—this is my first time on a jury. But, we would like to all express our admiration for counsel on both sides, and for your good self, sir, in your very complete instructions to us. We feel that the entire case has been conducted with great dignity of demeanor, and we hope that all courts in our great Country are conducted this way.

"THE COURT: Thank you very much, Admiral Fife. I don't know how many of you realize that the words you have just heard are from a retired—is that right?

"THE FOREMAN: Yes, sir.

"THE COURT: A retired Admiral of the United States Navy. And, I thank you, sir, on behalf of all of us."]